### TITUS v. STATE TAX COMMISSION.

1. TAXATION—PROPERTY—ASSESSMENT—UNIFORMITY.
    "A uniform rule of taxation" of property as set forth in the Constitution requires not only uniformity in the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation coextensive with the territory to which it applies (Const 1908, art 10, § 3).

2. SAME—VARIANT PROPERTY ASSESSMENT—VACATION—UNIFORMITY —REASSESSMENT.
    State tax commission's order approving city board of review's assessment of 20% of the property in the city by a formula differing from that used in assessing the remainder is vacated as being violative of the uniformity requirements of the Constitution and the true and lawful assessment ordered made according to statute (Const 1908, art 10, § 3; CLS 1961, § 211.152).

3. SAME—STATE TAX COMMISSION—APPEAL TO COURTS.
    A taxpayer has a clear right to judicial relief from order of State tax commission, where the commission committed an

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 51 Am Jur, Taxation § 162.
[3] 51 Am Jur, Taxation § 648.
[4] 14 Am Jur, Costs § 91 et seq.

error of law in confirming the questioned assessment against the taxpayer's property (Const 1963, art 6, § 28).

4. COSTS—STATE TAX COMMISSION—VARIANT ASSESSMENT OF PROPERTY.

No costs are allowed in certiorari proceeding against State tax commission to obtain relief from its order confirming city's assessment of property within the city by variant formulae.

KAVANAGH, C. J., and ADAMS, J., dissenting.

Appeal from State Tax Commission. Submitted October 6, 1964. (Calendar No. 7, Docket No. 50,664.) Decided February 2, 1965. Rehearing denied March 1, 1965.

Appeal in the nature of certiorari by Leon O. Titus and others from an order of the State Tax Commission confirming the real property tax assessment on homestead property. Order vacated.

*Joseph W. Planck,* for plaintiffs.

*Donald Teel,* for plaintiffs on application for rehearing.

*Frank J. Kelley,* Attorney General, *James R. Ramsey,* Acting Solicitor General, *T. Carl Holbrook* and *William D. Dexter,* Assistant Attorneys General, for defendant.

SOURIS, J. On plaintiffs' application, we granted them leave to appeal in the nature of certiorari from an order of the State tax commission confirming the 1963 city real property tax assessment of their Lansing homes. It is their claim that in 1963 the Lansing assessor assessed about 20% of the real property in Lansing, including their own, by a method of assessment different from that used in the assessment of the remainder of the real property in the city, thereby depriving them of the guaranties

of equality and uniformity granted by article 10, § 3, Constitution of 1908 and by CLS 1961, § 211.24 (Stat Ann 1960 Rev § 7.24).

Although the record made before the commission is not as complete and detailed as might be desired, we may conclude therefrom that beginning in 1963 the assessor undertook to reappraise all of the real property in the city. Because of the enormity of the task, it was contemplated it would require several years to complete. In the first year of the project, the tax year here involved, 20% of the properties were physically examined and reappraised. Land appraisal was based on current sales prices for comparable land. Improvements were appraised on the basis of their current cost of reproduction less depreciation. These properties then were assessed by a method not theretofore utilized in Lansing. Their assessed value was determined by increasing the appraised value of improvements by 15%, 20%, or 25%, depending upon the subdivision in which located,[1] and by adding 40% of the resultant to 40% of the appraised value of the land. The remaining real property in Lansing was not physically examined. Instead, the assessor used the same appraised value determined in prior tax years for those properties and, after "reviewing" the preceding tax year's assessed value in a manner not described by the assessor, the assessed value was "reposted" for 1963. While the assessor did not describe the methods by which the appraised and assessed values of those properties theretofore had been determined, there was admitted in evidence, without objection, a report of a citizens' committee on tax assessments, dated January 29, 1962, which describes the methods of assessment then used in Lansing.

[1] The record reflects one exception. In one subdivision, a factor of 1.15 was applied to one taxpayer's building, while a factor of 1.25 was applied to another's.

That description has not been challenged as inaccurate. From it we determine that prior to 1963 the Lansing assessor assessed land at a "certain" percentage of its 1936 value while improvements were assessed on the basis of cost of reproduction less depreciation adjusted to 1947 construction costs.

The record discloses that the city council of Lansing, recognizing the manifest unfairness of the assessment of a part only of the city's real property by the new method of assessment, by unanimous resolution[2] requested the board of review to postpone a change in the method of assessment until the new method could be applied uniformly to all property in the city. The council's request was not granted.

From the record made before the defendant commission the conclusion is inescapable that plaintiffs' real property, as well as about 20% of the property in Lansing, was assessed by a method different from that applied to the assessment of the remainder of

---

[2] "Resolved by the city council of the city of Lansing:

"Whereas, the city assessor has complied with the recommendations of the mayor's tax assessments committee, said recommendations having to do with basic and far-reaching changes in the methods and formula by which property assessments are levied, and

"Whereas, such basic changes will have direct and substantial effect on certain arbitrarily selected groups of property owners at this time, permitting large numbers of the city's taxpayers to continue to enjoy the benefits of the existing and substantially lower methods of assessment,

"Now, therefore, be it resolved:

"That the board of review is hereby requested to take the following action:

"1. Declare an immediate moratorium on the newly announced residential property assessments formula for the city of Lansing.

"2. Direct the city assessor to proceed with the reappraisal of all properties within the city, as recommended by the tax assessments committee, and to effectuate new assessments *only* when *all* properties have been properly appraised and assessed, thus assuring fair and equitable treatment for all property owners.

"3. During the period of moratorium it is further recommended that additional study be given to the new formula and methods of property assessment to assure fairness and equity on a long term basis.

"4. Continue to appraise and adjust assessments under the old formula until the new formula can be applied to the whole city."

the real property in Lansing. Whether either of the methods used conformed to the then applicable legislative mandate that real property be assessed at its "true cash value" (CLS 1961, § 211.24 [Stat Ann 1960 Rev § 7.24]), is unnecessary to be determined; it is sufficient for purpose of decision that the variant methods used deprived plaintiffs of the guarantee of uniformity of taxation provided by article 10, § 3 of the Constitution of 1908. See *Huron-Clinton Metropolitan Authority* v. *Boards of Supervisors of Five Counties,* 304 Mich 328, 335, 336, where this Court adopted the following from *Exchange Bank of Columbus* v. *Hines,* 3 Ohio St 1, 15:

" 'What is meant by the words "taxing by a uniform rule?" And to what is the rule applied by the Constitution? No language in the Constitution, perhaps, is more important than this; and to accomplish the beneficial purposes intended, it is essential that they should be truly interpreted, and correctly applied. "Taxing" is required to be "by a uniform rule;" that is, by one and the same unvarying standard. Taxing by a uniform rule requires uniformity not only in the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation; and this equality of burden cannot exist without uniformity in the mode of the assessment, as well as in the rate of taxation. But this is not all. The uniformity must be coextensive with the territory to which it applies. If a State tax, it must be uniform over all the State; if a county, town, or city tax, it must be uniform throughout the extent of the territory to which it is applicable.' "

The order of defendant State tax commission of October 8, 1963, is vacated and the commission is directed to determine the true and lawful assessment of plaintiffs' property, as provided in CLS 1961, § 211.152 (Stat Ann 1960 Rev § 7.210), and in

accordance with this opinion.[3] · No costs may ·be taxed.

Dethmers, Kelly, Black, Smith, and O'Hara, JJ., concurred with Souris, J.

Adams, J. *(dissenting)*. The problem in this case is one of the proofs. Admittedly, no taxation principle is of greater importance than uniformity. In 1963, there were approximately 31,000 residential properties in Lansing. The assessor selected about 6,000 to be reappraised as part of such a program for all residential properties.

Appellants' claim is stated in their brief:

"Appellants claim that there has been a systematic, intentional, and arbitrary assessment of their realty (and that of about 6,000 other owners of residential property) at both (1) a higher percentage of true cash value, and (2) by a different mode or manner of appraisal than was employed in the great majority of residential properties in Lansing for the year 1963."

Of the 6,000 owners of residential property *reappraised,* it does not appear whether any steps were taken by them to protest their *assessments* to the city assessor. It is apparent, however, that some taxpayers protested the assessment of their property to the Lansing board of review, since we are told in appellants' brief:

"Of the taxpayers who protested to· the Lansing board of review, the owners of some 54 properties appealed to the State tax commission. The tax com-

---

[3] Plaintiffs' right to appellate relief is clear, the State tax commission having committed an. error of law in confirming the 1963 assessment against plaintiffs' property. See article 6, § 28 of the Constitution of 1963: "In the absence of fraud, error of law or, the adoption of wrong principles, no appeal may be taken to any court from any final agency provided for the administration of property tax laws from any decision relating to valuation or allocation.".

mission heard jointly the 54 appeals, presenting common issues as to uniformity of taxation and equal protection of the laws."

Of the 54 appellants who pursued their remedies past the board of review to the Michigan tax commission, only appellants Leon O. Titus and wife now stand before this Court. They claim their appeal is in the nature of a representative case. However, of the 54 appeals taken to the tax commission, 14 were given relief and 40 were upheld. Since there was no uniform disposition by the commission, it is evident that each case was handled on its own facts. The result is that appellants stand before this Court not in a representative capacity, as they claim, but on the merits of their own case.

Ernst, the Lansing city assessor, was the only witness to testify before the tax commission. He was cross-examined by appellants' counsel. Ernst was careful to differentiate between *appraisal* procedures and *assessment* procedures, as the following questions and answers serve to indicate:

"*Q.* Now, then, these 31,000 residential properties in Lansing. About how many were reappraised within the past year, and the reappraisals reflected in the 1963 taxes?

"*A.* Are you speaking of those *appraised,* not *assessed?*

"*Q.* Yes.

"*A.* About 6,000 properties actually physically inspected. * * *

"*Q.* Did you earlier this year announce to the city counsel [council] that you are undertaking the appraisal of the property in the city?

"*A.* Set up a program of *reappraisement,* not *reassessment.* * * *

"*Q.* And all of their [the appellants'] properties were reappraised under this program?

"*A.* *Reappraised,* yes. * * *

"*Q.* Leaving 40% in the future?
"*A.* To be physically inspected, yes.    *    *    *
"*Q.* Now, with regard to Reuben Shipman, you have on here [work sheet], two different methods for appraising his property, did you not? .
"*A.* We use a number of different methods of appraising property. We are interested in getting a cash value regardless of the method." (Emphasis supplied.)

Once the properties had been appraised, various factors, particularly evidence of sales in an area, were taken into account in making the assessment:

"*Q.* Now, what was that factor?
"*A.* That factor reflects a market demand for that particular area as reflected in the sales. This is a mechanic at arriving at assessment.    *    *    *    We use an approach, not a method.    *    *    *    This is the reason    *    *    *    *each assessment is reviewed,* regardless of the mechanic.    *    *    *    This is a tool to arrive at value.    *    *    *
"*Q.* Do you find this method of appraisal of residential property recommended in the assessors' tax manual approved by the tax commission, the State tax commission?
"*A.* Yes." (Emphasis supplied.)

The appraisal values were increased by various percentages from 10% to 25% before reduction to the 40% assessment figure which was applied across the board to all 6,000 properties.

After physical inspection of appellants' property, the assessed valuation was increased from $5,100 to $7,800. According to appellants' appraisal, the market value of their property is $17,500. While the increase in their assessment was substantial, if the property had been underassessed the increase would be no basis for objection.

Appellants challenge the validity of the 40% factor for so-called cash value on the assessment rolls.

They do so upon the basis of a paper prepared by Milton C. Taylor, Professor of Economics, Community Development Institute, Michigan State University, with the assistance of James F. McCarley, entitled, "Relationship of Tax Assessed Valuations to the Sales Values of Real Properties in Greater Lansing."* According to Professor Taylor's paper, which was a study of assessment levels for the city of Lansing, the city of East Lansing, Meridian township, and Lansing township, the average for the city of Lansing was 34.38%.

"For the city of Lansing in particular, the probability is 99% that the mean value lies within a range of 33.40 and 35.36%. This reflects that the sample size of 483 properties in the city of Lansing is adequate for meaningful analysis."

Professor Taylor was not produced as a witness. His sampling consisted of 483 properties out of about 31,000. Under cross-examination, the city assessor's attention was drawn to Professor Taylor's report and he was asked:

"*Q.* These represent averages applied by several assessors, determined to be—well, for the city of Lansing, this particular problem, is 99%, that is the main [mean?] value lies in a range of 33.40 and 35.36 %. Now, in your experience as city assessor, is that an accurate statement?

"*A.* It would for certain select part, excluding all new residential property which we are assessing at a higher level. Come on the roll at a higher level because of the mechanics of the appraisal system.

"*Q.* Would you not say that a percentage of the true cash value assessed in the past, would be around 33 to 35%?

"*A.* I think it would be higher than that.

"*Q.* How high?

"*A.* If I am not mistaken, I would say 37 or 38%."

* Unpublished.—Reporter.

The city assessor further testified that the valuation figure for tax purposes in the city of Lansing in some areas is substantially above 40% and in some areas substantially below that percentage.

Evidently the tax commission gave little or no weight to Professor Taylor's paper. He was not produced as a witness. There was no opportunity to test the validity of his findings by examination of him. His paper is purest hearsay and is entitled to no credence upon this appellate review.

As for the resolution adopted by the Lansing city council, it has no proper place, either, as evidence in these proceedings. The city assessor is charged with the responsibility for assessments, not the city council. His acts are subject to review by the board of review and, from that body, to further review by the tax commission. The city council resolution has no probative value and there is no basis in law or fact for this Court to accept its purported findings. Similar treatment should be accorded the report of the citizens' committee, relied on in the majority opinion. In *Derrick* v. *Blazers,* 355 Mich 176, 181 (69 ALR2d 1143), this Court quoted 3 Jones, Evidence (2d ed), § 1084, as follows:

" 'The rule against the admissibility of hearsay is so sweeping that it necessarily includes within its scope written statements which fall within the general definition of hearsay. No exception to the rule is warranted by the mere fact that the particular information, report, or rumor is reduced to writing, * * * or [is] *even in an official record.'* " (Emphasis supplied.)

To the same effect, see *Michigan Bankers' Ass'n* v. *Ocean Accident & Guarantee Corp., Ltd.,* 274 Mich 470; 31A CJS, Evidence, § 194, p 547; 11 MLP, Evidence § 113, p 272.

To demand that all residential properties of a city be appraised at one time to achieve uniformity com-

pletely overlooks the realities and necessities of the appraisal process. It is a continuing operation as distinguished from the assessing process which is done once yearly. On the other hand, if we say the appraisal process may be done over a period of years, but cannot be used to make assessments until it is completed, those whose properties were appraised the first year can complain that they did not receive the same treatment, time-wise, as those appraised a year or more later.

Considering the magnitude of the yearly assessing problems in a city where the residential properties alone approximate 31,000, the fact that only some properties are physically inspected in any one year does not, in and of itself, invalidate the assessment of the physically inspected properties; nor is the fact that the assessor attempted to assess appellants' property at 40% of true cash value, when he believed the general level of the assessed value of all classes of property was around 38%, such a variance as to constitute intentional and arbitrary discrimination in the execution of the tax laws. As stated in *S. S. Kresge Co.* v. *City of Detroit,* 276 Mich 565, 572 (107 ALR 1258), quoting *Great Northern R. Co.* v. *Weeks,* 297 US 135 (56 S Ct 426, 80 L ed 532):

" 'Courts decline to disturb assessments for taxation unless shown clearly to transgress reasonable limits. Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on the challenged assessment.' "

Likewise, in *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 US 350 (38 S Ct 495, 62 L ed 1154), the United States Supreme Court upheld this Court's decision holding that, although the plaintiff's property was probably assessed higher than other properties within the same county, there was nothing to

show an intent to discriminate.  See, also, *Templin
v. Township of Nottawa,* 362 Mich 257, 260.

To overturn a determination of the tax commission, we must find that it applied illegal principles or fraud.  *Copper Range Co.* v. *Adams Township,* 208 Mich 209, 217; *Kingsford Chemical Company* v. *City of Kingsford,* 347 Mich 91, 111; *Templin* v. *Township of Nottawa, supra.*

I would vote to affirm the State tax commission's order made October 8, 1963.  No costs.

KAVANAGH, C. J., concurred with ADAMS, J.