WASHTENAW COUNTY v STATE TAX COMMISSION

LAPEER COUNTY v STATE TAX COMMISSION

OAKLAND COUNTY v STATE TAX COMMISSION

Docket Nos. 64939, 64970, 65037. Submitted December 8, 1982, at Lansing.—Decided June 21, 1983. Leave to appeal applied for.

The Counties of Washtenaw, Lapeer and Oakland appeal by leave granted from determinations by the State Tax Commission establishing the state equalized valuation of property at values higher than those determined by the county boards of commissioners.

Washtenaw County alleges that the commission erred in refusing to discount the sales prices of real estate to reflect the effect of so-called "creative financing", which involves some form of seller-extended credit and which results in the enhancement of the selling price. Washtenaw County also alleges that sales data should be weighted in favor of those values closer in time to tax day, December 31, to reflect a more accurate valuation in a changing market and that the county was denied due process by various actions of the commission.

Lapeer County likewise alleges that the commission erred in not discounting sales for the effects of "creative financing" and that the commission's study of agricultural lands was based on nonrandom samples.

Oakland County, like Washtenaw, alleges that the commission erred in not allowing a weighting of sales data to reflect the changing market.

The appeals of the three counties were consolidated. *Held:*

1. The State Tax Commission has erred by applying a method

REFERENCES FOR POINTS IN HEADNOTES

[1] 71 Am Jur 2d, State and Local Taxation §§ 152, 169.

[2-5] 71 Am Jur 2d, State and Local Taxation §§ 125, 759.

[6] 5 Am Jur 2d, Appeal and Error § 830.

73 Am Jur 2d, Statutes §§ 46, 145, 146.

[7] 71 Am Jur 2d, State and Local Taxation § 20.

[8] 72 Am Jur 2d, State and Local Taxation §§ 831-833.

[9] 2 Am Jur 2d, Administrative Law §§ 610 *et seq.,* 653, 677.

72 Am Jur 2d, State and Local Taxation § 712.

for assessing property for equalization without accounting for the effects of "creative financing" on sales prices. The effect of such financing arrangements must be considered in determining the true cash value of property. The case is to be remanded to the commission to develop a method for accounting for such financing.

2. The 30-month or 12-month studies of sales data required by the commission for equalization purposes provide inaccurate data in a market which is in a period of change at or near tax day. Therefore, the commission should develop a formula for weighting those sales occurring closest to tax day.

3. Washtenaw County's allegation of a denial of due process is rejected. In light of the assumption by the Court of the accuracy of the county's findings of fact in regard to the creative financing issue, the delays complained of by the county were harmless.

4. The commission's cross-check of Lapeer County's valuations of agricultural property was not improper.

Affirmed in part, reversed in part, and remanded for further proceedings.

ALLEN, J., concurred in part and dissented in part. He would hold that the State Tax Commission did not err in refusing to make adjustments for the effect of "creative financing". He would hold that, while the sale price is not always the "true cash value" and may be adjusted on an individual basis, there is no authority for, nor did the Legislature intend to permit, across-the-board adjustments to reflect price enhancements in sales involving seller-extended terms.

OPINION OF THE COURT

1. TAXATION — PROPERTY TAX ASSESSMENT — UNIFORM TAXATION.

All real property owners within a taxing district must be taxed under an unvarying standard and at a uniform rate; the goal of equalization is to be achieved both within and among the different counties (Const 1963, art 9, § 3).

2. TAXATION — CASH VALUE — SALES PRICE.

Sales price does not necessarily determine the true cash value of property.

3. TAXATION — PROPERTY TAX ASSESSMENT — "CREATIVE FINANCING".

A tax assessment system which does not consider the effects of so-called "creative financing" on the sale price of real property violates the constitutional requirement of equality of taxation (Const 1963, art 9, § 3).

CONCURRENCE IN PART, DISSENT IN PART BY ALLEN, J.

4. TAXATION — CASH VALUE — USUAL SELLING PRICE.

*The "cash value" of real property is defined by statute to be "the usual selling price" at private sale; thus, the majority of sales of a particular class of property are indicative of the usual selling price, regardless of how financed (MCL 211.27[1]; MSA 7.27[1]).*

5. TAXATION — PROPERTY TAX ASSESSMENT — "CREATIVE FINANCING".

*The statutory exclusion, for purposes of assessment of real property, of amounts paid for obtaining financing of the purchase price of the property does not include the amount by which the purchase price may have been increased because the seller is being paid on a land contract or other so-called "creative financing" arrangement (MCL 211.27[3]; MSA 7.27[3]).*

6. APPEAL — JUDICIAL CONSTRUCTION — STATUTES.

*The Court of Appeals should not by judicial interpretation change the effect of a statute where the Legislature has refused to pass legislation designed to so change the statute's effect.*

7. TAXATION — PROPERTY TAX ASSESSMENT.

The State Tax Commission may devise a formula for weighting real estate sales data in the assessment process in order to reflect changing market trends close to tax day; sales ratio studies should, however, extend over periods of not less than 12 months.

8. TAXATION — EQUALIZATION HEARINGS — CONTESTED CASES.

Inter-county equalization hearings before the State Tax Commission are not "contested cases" subject to the rules promulgated under the Administrative Procedures Act (MCL 24.201 *et seq.;* MSA 3.560[101] *et seq.).*

9. TAXATION — APPEAL — STATE TAX COMMISSION.

Review by the Court of Appeals of decisions of the State Tax Commission is limited to questions of fraud, adoption of wrong legal principles, and errors of law; the Court is bound by the commission's factual determinations.

*Robert J. Harris,* for Washtenaw County.

*Eugene G. Wanger,* for Lapeer County.

*Leo Goldstein,* for Oakland County.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Ross H. Bishop,* Assistants Attorney General, for the State Tax Commission.

Amici Curiae:

*Cohl, Salstrom, Stoker & Aseltyne, P.C.* (by *Patrick A. Aseltyne),* for Ingham County and Livingston County.

Before: Bronson, P.J., and T. M. Burns and Allen, JJ.

T. M. Burns, J. Although we join Judge Allen in Issues II, III and IV, we cannot join in Issue I because we do not agree that "usual selling price" necessarily means whatever a buyer pays for property.

Because of extraordinarily high interest rates, some real estate buyers and sellers have recently used different forms of "creative financing" to finance their property sales. Using such financings, a buyer might pay more for a property where the payments are made over an extended number of years than he or she would have if the sale were financed through a conventional mortgage. Although the property's value remained constant, the selling price would differ considerably.

This fact was recognized by Judge Bronson while dissenting in *Antisdale v Galesburg,* 109 Mich App 627, 635-636; 311 NW2d 432 (1981):

"Suppose both houses are for sale. Seller A is a relatively well-to-do retiree who does not immediately need the sale price of his home. Indeed, A is happy to take monthly payments from a buyer over a period of years and would consider these payments a pseudoannuity. A wants to move to Florida and would like to

sell his house quickly. Seller B, on the other hand, needs the entire sale price from his house forthwith. B plans to use the proceeds of the sale to embark on a new business venture. Furthermore, B can offer no creative financing arrangements.

"A contracts with C for the sale of his house. C can only make a $10,000 down payment. However, C recently has been promoted within his corporation and has received a 50% increase in salary. The contract price for the sale of the house is set at $80,000. Of this amount, C puts down his $10,000 and agrees to pay the remainder at 7-1/2 percent interest over 25 years. B contracts with D. However, D must obtain a 30-year, 16 percent conventional mortgage to buy B's home. Thus, the contract price established for the house is $65,000. As I read the majority opinion, A's house would be assessed at a true cash value of $80,000. I believe, however, that what A's buyer, C, has really purchased is a house along with favorable financing terms."

The American Institute of Real Estate Appraisers recently supported this conclusion when it concluded that "[l]and contract terms typically create a higher selling price than the house would sell for cash, or cash down to a new mortgage at market rates".[1] As such, the "terms of a sale are a critical adjustment factor that can have a significant effect on sales prices and should be considered by all appraisers". American Institute of Real Estate Appraisers, Michigan Chapter No 10, Report of the Research Committee, p 27.[2]

The State Tax Commission has, however, concluded that this factor should not be considered when equalizing assessments. Apparently, the Legislature has also reached this conclusion, as evidenced by their refusal to amend MCL 211.27(1);

[1] American Institute of Real Estate Appraisers, Michigan Chapter No 10, Report of the Research Committee, Cover Letter.

[2] Appellant County of Washtenaw's study shows that, to a certain extent, creative financing does artificially enhance the "sales price".

MSA 7.27(1) and MCL 211.27(3); MSA 7.27(3) to permit adjustments for creative financing. However, the Legislature is to a large extent bound by our constitution. Const 1963, art 9, § 3 states:

"The legislature shall provide for the uniform general ad valorem taxation of real and tangible personal property not exempt by law. The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments."

The Convention Comment to this constitutional provision says: "The important constitutional objective is uniformity of assessment, regardless of the level at which property is commonly assessed." 2 Michigan Compiled Laws Annotated, p 513. This uniformity requirement means that all real property owners within a taxing district must be taxed under an unvarying standard and at a uniform rate. It implies equality in the burden of taxation. *Titus v State Tax Comm,* 374 Mich 476; 132 NW2d 647 (1965). See also *Pine Grove Twp v Talcott,* 86 US (19 Wall) 666; 22 L Ed 227 (1873). A tax rate imposed by a single taxing unit must be identical throughout its territory. *East Grand Rapids School Dist v Kent County Tax Allocation Bd,* 415 Mich 381; 330 NW2d 7 (1982). This goal of equalization is to be achieved both within and among the different counties. *Ann Arbor Twp v State Tax Comm,* 393 Mich 682, 688; 227 NW2d 784 (1975). Finally, the courts of this state have often held that sales price does not necessarily determine the true cash value of property. See *Fisher-New Center Co v State Tax Comm,* 380 Mich 340, 362; 157

NW2d 271 (1968); *Antisdale, supra,* p 636 (BRON-SON, J., *dissenting*).

Therefore, a tax assessment system which does not consider creative financing is in fact unconstitutional. Two people owning identical pieces of real property, both worth precisely the same amount and both bought simultaneously, should not be taxed at different rates merely because they purchased their properties under different financing arrangements. As such, the Legislature has no power not to allow appropriate adjustments for SCEPE or "creative financing" sales.

This position was taken by *Village Green Co v Derderian,* 67 App Div 2d 714; 412 NYS2d 421 (1979), where the lower court had disregarded the sales price when it valued a property. On appeal, the appellate division affirmed by ruling:

"At the time of the sale, there was a favorable 7% mortgage on the premises for about $459,000. The purchaser paid $170,000 in cash and was given a remarkable purchase-money mortgage of about $416,000, which, among other things, forgave all interest and payments for five years and then required payments at the rate of 4% for the next 10 years. The purchaser was also entitled to a $100,000 prepayment discount should it choose to pay within five years of the closing. Given the terms of the purchase-money mortgage, the trial court was justified in finding that the connection between the purchase price of the property and its true fair market value was tenuous."

Consequently, we conclude that the commission has applied the wrong method for assessing property for equalization by not accounting for the effects of creative financing on the sales price. As such, we are remanding all three cases to the

commission to develop a method to account for creative financing.[3]

Reversed in part, affirmed in part and remanded. No costs, this being a public question.

Bronson, P.J., concurred.

Allen, J. *(concurring in part and dissenting in part)*. Appellants, Washtenaw, Lapeer and Oakland Counties, appeal by leave granted from the State Tax Commission's (STC) determinations establishing the 1982 state equalized value (SEV) for various classes of property in each of the counties at values higher than the county equalized value (CEV) established by the county boards of commissioners. Appellants' positions are joined by Ingham and Livingston Counties, which have filed a joint brief as amici curiae.

Washtenaw County contests the state equalized valuation of the county's residential and agricultural classes of property. Three grounds of error are raised, the first being the STC's refusal to discount the sales price to reflect "creative financing".

Washtenaw's county equalization department originally performed sales ratio studies without factoring in the influence of "creative financing". Later, a second sales ratio study was conducted which concluded that 8.5% of the gross sales price should be excluded from the fair market value as a "creative financing" adjustment.

"Creative financing" occurs where the seller permits the buyer to assume the seller's existing low mortgage ("assumption"), or the seller pays a lending institution to loan to the buyer at the low

[3] We would like to take the time and space to thank the State Tax Commission for putting the enormous effort into writing an opinion pursuant to our order of October 27, 1982.

market interest rate ("buy-down"), or the seller pays "points" to an institution to further an FHA-guaranteed, below-market interest rate mortgage loan to the buyer ("FHA mortgage"), or the seller sells to the buyer on a land contract ("land contract"), or the buyer both assumes the seller's old mortgage and borrows more from the mortgagee ("blend"). Washtenaw determined that, while not all sellers increased their sales price as compensation for this credit extension, many did. The original estimates (as of January 18, 1982) concluded that at least 85% of 1981 residential sales in the county involved some form of seller-extended credit and that in the average sale of this kind, at least 10% of the price was a price enhancement for this service.

Once all six of Washtenaw's studies had been completed, Washtenaw asserted an alternative position, claiming that at least 89% of all sales involved seller-extended credit and 8.2% of the average price of these sales was consequently enhanced. The earlier figure was based on cash equivalency discounting studies which discounted separately the amount of the sales price due to "seller credit—extension price enhancement" ("SCEPE"). The subsequent figures were derived from "across-the-board" discounting in which the ratio of average assessed value to average sales price is determined separately for conventional and cash sales in which the seller extended credit.

Washtenaw's second ground for appeal concerns the proper time span allowed by the STC for sales ratio studies conducted by the county. The Assessor's Manual prescribes that all sales ratio studies shall cover a 30-month time span ending June 30 of the year containing the tax day. However, the STC, for the 1982 equalization, permitted counties

to either use the 30-month study or use a study covering the 12 months immediately preceding tax day.

It is Washtenaw's claim that with respect to the residential class of property the selling price was much lower in the first quarter of 1982 than in the last quarter of 1981. At the May 18 hearing before the STC, Washtenaw presented data from a sales ratio study of the residential class covering the nine-month period from June 1, 1981, to March 31, 1982. Washtenaw also put in evidence a paper prepared by Dr. Michael Skaff, a well-known mathematician, which argued that sales closer to the tax day, December 31, 1981, should be given greater weight than sales more remote to tax day. The Skaff paper is the same paper used by Oakland County in its hearing before the STC and is discussed later in this opinion in connection with the Oakland County appeal. The STC, in effect, rejected the weighting argument and refused to consider sales ratio studies whose durations were other than the 30- or 12-month period prior to tax day.

Washtenaw County's third issue concerns alleged procedural unfairness in the State Tax Commission's use of the Lynch study, a study of 193 sales. The county claims that it was denied due process because the State Tax Commission: (1) considered matters not placed in the record, (2) took into account materials not shown the county despite timely demand therefore, and (3) delayed in producing certain back-up data.

Lapeer County's appeal concerns the STC's determination of state equalized valuation for residential property, agricultural property, and developmental property (vacant land held for develop-

mental purposes).[1] The main thrust of the appeal, like the Washtenaw County appeal, concerns the STC's refusal to discount sales prices by the amount of the "creative financing" involved. Unlike the Washtenaw appeal, the terms "creative financing" or "SCEPE" were not used in the Lapeer briefs. Instead, Lapeer contends that the STC erred by treating the face value of the land contract or warranty deed by which the property was sold as the true cash value (TCV). Lapeer argues that because interest on land contracts never exceeds 11% (the Michigan legal maximum), and because the money market rate of interest readily available at the time substantially exceeded 11%, the face amount or gross sales price on the land contract sales was not a valid measure of the TCV of the properties because the price should have been discounted to reflect this discrepancy. Studies conducted by Lapeer County indicated that approximately 28% of all the 1980 and 1981 sales were by land contract.

Lapeer County raises a second issue, not found in the appeals by Washtenaw and Oakland Counties, namely, that the STC's study of agricultural lands was based on nonrandom samples. The sample used in the study was allegedly nonrandom because "all (or almost all) of the property selected by the STC for their studies were properties which had recently sold".

The Oakland County board of commissioners set the CEV for its residential class of property at $9,075,300,224 and the STC established the SEV at $9,619,223,876. Thus, Oakland's appeal is limited

[1] The STC increased the board of commissioner's CEV for residential property from $403,599,481 to $437,411,779 (8.38%). The increase for agricultural lands was from $156,725,351 to $168,183,482 (7.95%). The increase in the developmental class was from $11,698,832 to $12,554,559 (7.31%).

to the STC's determination of equalized value for the residential class of property only. The issue of "creative financing" is not involved.[2] Instead, the issue raised is the same as the second issue raised by Washtenaw County, *viz:* whether, in a declining market, the STC erred by not allowing a greater weighting of sales occurring near the tax day, December 31, 1981.

Oakland County argues that its sales data showed a stabilization of market values for the first five months of 1981, followed by a decline in values from June through December 1981. Oakland County hired a well-known mathematician, Dr. Michael Skaff, to assist it in conducting a sales assessment ratio study. In making his study, Dr. Skaff relied on a 12-month sales ratio study which adjusted sales made in the forepart of the 12-month period to reflect the declining market conditions existing as of tax day, December 31, 1981. Oakland agrees that assessors and equalization boards are bound by Chapter XVI of the Assessor's Manual which prescribes the use of a 30-month sales ratio study. MCL 211.721; MSA 7.40. However, Oakland states that this 30-month study is weighted by sales occurring during the early part of the three-year period and so produces an excessively high equalized value in a declining market. In addition, Oakland states that the STC permits an additional 12-month sales ratio study for use when a unit "faces a declining market and where there is sufficient sales volume to get an adequate measure of assessment levels".

[2] Because of time limitations, Oakland County did not make a complete study to determine the adjustments that would have to be made to accurately reflect "creative financing". Instead, Oakland in its briefs on appeal relies on the studies performed by Washtenaw and amicus curiae Livingston County. At oral argument on appeal, counsel stated that "creative financing" was not part of the Oakland appeal but was briefed to support the arguments presented by Washtenaw County.

Accordingly, Oakland concludes that the STC erred as a matter of law in insisting that the 30-month sales ratio study described in the Assessor's Manual be used and further erred in not allowing the county and Dr. Skaff to give greater weight to sales occurring closest to the December 31, 1981, tax date. Amici Curiae argue that in a declining market counties should be permitted to use sales ratio studies from the three months prior to and the three months after tax day. According to amici curiae, such a time frame would prevent long term price movements from distorting the measurement of December 31 value. If this approach is rejected, Dr. Skaff's "weighted" sales ratio study approach should be permitted.

Based on the foregoing facts, the following issues are identified: (1) in determining "true cash value" must the STC make adjustments for the effect of "creative financing"; (2) should "weighting" of sales towards tax day or changing the time frame from other than 30 months or 12 months as allowed by the STC be permitted; (3) was Washtenaw County denied procedural fairness; and (4) was the STC's study of Lapeer County's agricultural class of property invalid because it was nonrandom?

I. *In determining "true cash value" must the STC make adjustments for the effect of creative financing?*

Appellee STC contends that, even if accounting for the effects of creative financing or SCEPE-related transactions are permissible adjustments, appellants, particularly Washtenaw County, did not sufficiently or accurately identify the percentage of sales prices that were so related. A considerable portion of the briefs on appeal is devoted to this question. However, for purposes of this appeal,

we need not resolve this issue. We will assume, hypothetically, that the percentage of total sales so identified is correct and turn to the question of whether, *as a matter of law,* such transactions should be excluded by the STC.

The basic rationale supporting appellants' claim for downward adjustments in the 1982 value of real property is that, under conventional financing where the buyer pays part down in cash and pays the balance in cash from money loaned him by a third party (usually a bank), the seller receives cash. Knowledgeable sellers commonly accept a lower price if received in cash rather than waiting over a period of years for the balance. As a consequence, a seller who accepts payment of the balance of the purchase price over a period of years, *at interest rates below the conventional market,* will ordinarily raise the selling price to compensate for the loss he sustains by being paid in installments at interest rates below the available market. Const 1963, art 9, § 3, provides that for purposes of taxation property is to be assessed at true cash value. *Safran Printing Co v Detroit,* 88 Mich App 376, 379; 276 NW2d 602 (1979). Since the bulk of properties sold in late 1981 and early 1982 were not sold under conventional financing arrangements but were sold on land contract or other seller financed inducements, appellants conclude, the land contract or other seller financed type sale must be discounted to arrive at true cash value.

A second rationale advanced by appellants why, as a matter of law, price enhancement resulting from SCEPE or "creative financing" prices must be excluded from assessed value is that under MCL 211.27(3); MSA 7.27(3) the Legislature clearly intended to exclude from the basic sales price

amounts paid by buyers for favorable financing. The relevant portion of the statute referred to reads as follows:

"(3) Beginning December 31, 1978, a city or township assessor, a county equalization department or the state tax commission before utilizing real estate sales data on real property purchases, including purchases by land contract, for the purpose of determining assessments or in making sales ratio studies for the purpose of assessing or equalizing assessments shall exclude from the sales data the following amounts to the extent that the amounts are included in the real property purchase price and are so identified in the real estate sales data or certified to the assessor as provided in subdivision (d):

"(a) *Amounts paid for obtaining financing of the purchase price of the property or the last conveyance of the property.*" (Emphasis supplied.)

Despite the excellence of appellants' briefs and oral argument on this issue of first impression, I am not persuaded. My reasons follow.

*First,* the term "true cash value" appearing in Const 1963, art 9, § 3, does not stand alone but must be read in context with the qualifying language "the legislature shall provide". The constitutional language reads:

"*The legislature shall provide for the determination of true cash value* of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments." (Emphasis supplied.)

To this end, the Legislature provided a definition of true cash value in § 27(1) of the general property act, MCL 211.27(1); MSA 7.27(1). It reads:

" 'Cash value' means *the usual selling price* at the place where the property to which the term is applied is at the time of assessment, *being the price which could be obtained for the property at private sale,* and not at forced or auction sale." (Emphasis supplied.)

All of the appellants concede that, because of the high interest rates prevailing in the marketplace, the majority of sales of agricultural and residential properties for the tax years in question was by some form of seller extended credit—primarily land contract. Thus, the majority of sales are indicative of the "usual selling price". Contrary to the statutory language referred to above, appellants' argument, if adopted, would result in the minority of sales becoming the indicator of the "usual selling price".

*Second,* the relative availability or unavailability of financing at favorable terms always affects the price at which property sells. Admittedly, property will generally sell for a lower price where it is paid for in cash and at a higher price where the seller must wait for payment over a term of years. But this does not lead to the conclusion that the price at which the property actually sells should be discounted in every situation where payment is not made 100% in cash. To do so totally ignores the market.

*Third,* MCL 211.27(3); MSA 7.27(3), upon which the appellants so strongly rely, does not refer to the amounts by which a seller enhances the price of his property because the seller is being paid on a land contract or other "creative financing" arrangement. Section 27(3) refers only to mortgage initiation fees, financial institution appraisals, credit checks, attorney fees and other charges made by a lending institution which advances funds to the buyer with which to pay for the

property. It does not include the so-called "premium" portion of the purchase price.

*Fourth,* the Legislature itself has refused to amend § 27(3) and § 27(1) so as to explicitly permit wholesale adjustments to be made for price enhancements under SCEPE or "creative financing" sales. In 1982, Senator Pierce of Washtenaw County introduced Senate Bill 890. That bill specifically proposed amendments to §§ 27(3) and 27(1) to allow for creative financing. The bill never moved. On the other hand, there was also introduced House Bill 5070 which did propose changes in § 27 but the changes did not include any mention of creative financing. The bill also proposed that assessments be lowered to percentages of 44% of true cash value in 1982, 39% in 1983, and 35% in 1984. On December 15, 1981, the bill passed the House with immediate effect. The bill also required the actual selling price of the property to be revealed. In January, the bill was introduced in the Senate and referred to the Finance Committee. The Finance Committee restored the 50% of true cash value provision on grounds that lower assessed ratios were not economically feasible and made other changes, none of which concerned wholesale discounting of "creative finance". On December 8, 1982, the Senate Analysis Section issued a first analysis of the bill as proposed by the Finance Committee. In relevant part it reads:

*"Opposing Argument:*
*"The bill does nothing to address the real problem of levels of assessments being artificially inflated by the current scarcity of mortgage money and resulting in frequent use of 'creative financing', whereby the price of property is increased to enable the parties to get around the limit of 11% on land contract interest and to offset the interest lost by the seller. Since there is no*

fixed formula for determining all the ways in which a purchase price may have been inflated, an assessment that deducts from the purchase price the items specified in the bill still might not reflect the true cash value. Because all the inflationary effects of creative financing on a purchase price have not been adjusted for, and *would* not be under the bill, *all* property taxes in the residential class in a community will continue to be higher when property is reassessed. However, a general downward adjustment to compensate for the use of creative financing is not permitted by the Tax Commission.

*"Response:* The problem presented by the opposing argument is real but irrelevant in the context of the bill. It is true that the requirement that a purchaser reveal the amount of certain items included in the purchase price of real property would not solve the problem of inflationary prices inherent in creative financing, nor totally obviate the effects of that problem on assessments, but it would be a major improvement on present practice. *Solving the broader problems caused by creative financing are outside the scope of the bill."* (Emphasis supplied.)

The history of the above-mentioned legislation forcefully rebuts appellants' claim that pursuant to § 27(3) or any part of the statute the Legislature "clearly intended" that price enhancement under land contract sales or other seller credit extensions should be excluded by the STC. Not only did the Legislature refuse to pass legislation specifically designed for such purpose, but it also, when amending the statute, declined to add such provisions. This Court should not and will not do by judicial interpretation that which the Legislature twice refused to do.

*Fifth,* this Court in *Antisdale v Galesburg,* 109 Mich App 627; 311 NW2d 432 (1981), rejected an argument similar to the claim made in the instant case. *Antisdale* involved the assessment of a 120-

unit apartment complex constructed under Farm-
ers Home Administration (FmHA) financing. The
STC assessed the property based on what it would
sell for in the market. The market selling price
was admittedly enhanced because of the favorable
FmHA low interest terms and because of tax
shelter opportunities. Petitioners appealed, not on
grounds that "the market value [was] inaccurate,
but that it [was] not a proper indication of the
value of the property because the value thus ob-
tained is based not on the property itself but on its
attendant financing and tax characteristics". *An-
tisdale, supra,* p 632. In a 2-1 decision, this Court
affirmed the valuation made by the STC. Judge
BRONSON dissented on grounds that the selling
price was enhanced by the favorable interest rate
and the fact that tax shelter advantages accrued
to the buyer.

In summary, while I agree that the sale price is
not always the "true cash value"[3] and under
§ 27(3) may be adjusted on an individual basis,
provided the back-up documentation required in
subsection (3)(d) is furnished, I cannot agree that
there is any authority or that the Legislature
intended to permit wholesale across-the-board ad-
justments to reflect price enhancements in sales
involving seller extended terms.

II. *Did the State Tax Commission err as a mat-
ter of law in insisting upon unweighted 30-month
and 12-month sales ratio studies determining the
level of assessment as of tax day, December 31,
1981?*

As noted earlier, this issue was not addressed by
Lapeer County but was raised by Oakland and

---

[3] *Fisher-New Center Co v State Tax Comm,* 380 Mich 340, 362; 157
NW2d 271 (1968); *Village Green Co v Derderian,* 67 App Div 2d 714;
412 NYS2d 421 (1979).

Washtenaw Counties. The issue was extensively addressed in the briefs of amici curiae. Defendant STC argues that only a 30-month study and a 12-month study are permitted by the Assessor's Manual and consequently no county should be allowed to use a study of lesser duration or ascribe heavier weight to sales made closest to tax day, December 31, 1981. According to the STC, sales made at Christmas time and New Years are highly suspect sales and generally too few to justify weighting.

Under MCL 211.2; MSA 7.2, the taxable status of property is to be determined for the 1982 tax year as of December 31, 1981:

"The taxable status of persons and real and personal property shall be determined as of each December 31, which shall be deemed the tax day, any provisions in the charter of any city or village to the contrary notwithstanding. No assessing officer shall be restricted to any particular period in the preparation of the assessment roll but may survey, examine or review properties at any time prior to or after the tax day."

However, because of the difficulty in determining the value of all real and personal property on that day from the relatively few sales that occur on the tax day, assessors, boards of equalization, and the STC conduct sales ratio studies over a broader period of time. This information is used to produce a ratio of the aggregate assessed value of the property to the aggregate assessed sales prices for the property in the study. The issue so posed is whether the 12-month and 30-month periods authorized by the Assessor's Manual provide an accurate picture of property values as of the tax day.

Appellants all contend that in a declining market the 30-month study represents a distorted view of property values as of December 31, 1981. Obvi-

ously, this is true if, as all counties but Lapeer contend, the last seven months of 1981 represented a declining market. The STC recognized this danger by authorizing the 12-month study.

All appellants contend that even the 12-month study is inaccurate unless the sales data is "weighted" to give more importance to sales occurring closer in time to the tax day. We agree that some such adjustment is needed to accurately reflect the value on tax day. While the STC correctly argues that insufficient sales occur on tax day for accuracy, and that a broad study may be necessary to encompass the fluctuations of the real estate market, there is no justification for ignoring evidence of an existing market trend.

The process of equalization is designed to enhance the goal of uniformity. *Allied Supermarkets, Inc v Detroit,* 391 Mich 460, 466; 216 NW2d 755 (1974). This uniformity is the end result of uniform true cash values. Such a goal may be achieved by a uniform valuation approach but, where necessary, the uniform approach must give way to the need for uniform true cash values. *Fisher-New Center Co v State Tax Comm,* 380 Mich 340, 369; 157 NW2d 271 (1968). In this case, some variation from the strictly uniform 30-month and 12-month studies may be necessary. This would be accomplished by the "weighting approach" mentioned earlier. Any study of at least 12 months duration will accurately represent property values as of tax day where those values remain stable. For counties experiencing such a market, no weighting would be required. However, where a decline or upturn exists in the market, weighting is necessary to truly portray the market picture.

However, while we opine that some weighting towards tax day should be permitted in a declining

or rising market,[4] we would oppose use of any study of less than 12 months and also oppose extending the study into the next calendar year. Time restraints alone and the necessity of meeting next year's statutory deadlines preclude stretching a study beyond December 31. Furthermore, we do not agree with appellants that counties should be given the freedom to choose their own length of study. Uniform equal assessment would become impossible if each county were to use a different study. The mandatory application of the Assessor's Manual was designed to prevent this precise evil.

Accordingly, we remand the Washtenaw and Oakland County appeals to the STC with instructions that sales ratio studies extending over not less than a 12-month period be reviewed and some weight given to sales occurring in the period closest to tax day. A formula for weighting to reflect changing market trends close to tax day should be devised by the STC. Only by permitting such weighting can an accurate picture of "true cash value" be presented. For Lapeer County, which did not raise this issue, remand is not ordered.

III. and IV. *Washtenaw County's due process and Lapeer County's random study issues.*

Washtenaw County devotes extensive portions of its briefs to its claim that it was denied procedural due process. Most of the argument on this issue relates to a dispute over the accuracy of the county's determination that 8.5% of average residential sales prices were SCEPE. Since for purposes of this

---

[4] We are not certain that in the long run counties will be helping by "weighting". In the past half-century there have been only two periods where property values declined as of tax day. In all other years the market was rising. Thus, the door is opened to the STC to argue that greater weight should be given to year-end sales occurring in a rising market. Under the 30-month study period ending July 1, before the December 31 tax day, the influence of a rising market is eliminated.

opinion we assumed that the county's findings of fact on the impact of creative financing were accurate, we find no prejudice to the county. For similar reasons, any delay by the STC in revealing to Washtenaw authorities statements from the Lynch study, a study relating to the impact of creative financing on county valuation, was harmless.

Further, we disagree that STC Rule 15(2), 1979 AC, R 209.15(2), was applicable to the "hearings" of May 10, May 18, and May 24. Rule 15(2) is applicable only in cases before the STC which are "contested". In *Emmet County v State Tax Comm,* 397 Mich 550, 558; 244 NW2d 909 (1976), the Supreme Court held that intercounty equalization hearings before the State Tax Commission are not "contested cases" subject to rules promulgated under the Administrative Procedures Act. MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.* While there may have been some short time lag between the Washtenaw request for certain information and the time it was supplied by the STC, given the complex nature of the multi-county hearings and the fact that the 1982 record consists of some 120,000 pages, we find the delay *de minimus.*

Lapeer County contends that the STC's cross-check of valuations made by the Lapeer County equalization department of the agricultural class of property was not a random sample since the STC primarily looked at property that had recently been sold and did not include properties which had not sold. However, an accepted method of cross-checking the accuracy of real property valuations is to compare the actual sale price with the valuation. More importantly, for purposes of this case, the cross-check revealed that the valuations actually made by the equalization depart-

ment were close to the selling price. The problem is that the county board of commissioners did not agree with its own equalization department and ordered the agricultural class reduced in value. Accordingly, we find no error.

In summary: as to all three counties I find no error in the STC's refusal to reduce the SEV for the various classes of property involved to reflect so-called "creative financing". As to Washtenaw and Oakland Counties, we find that the STC committed errors of law and adopted the wrong legal principle[5] in not permitting some weight to be given their required 30-month or optional 12-month sales studies. Appeals in those cases are remanded to the STC to re-establish a county SEV after due allowance for weighting under standards to be promulgated by the STC. As to Lapeer County, the determination of the STC is affirmed. No error is found in the due process or procedural issues raised by Lapeer and Washtenaw Counties.

Affirmed in part and remanded in accordance with this opinion. No costs, a question of public interest being involved.

---

[5] Review of STC decisions is limited to questions of fraud, adoption of wrong legal principles, and errors of law. We are bound by the commission's factual determinations. *Saginaw County v State Tax Comm,* 54 Mich App 160; 220 NW2d 706 (1974), *aff'd* 397 Mich 550; 244 NW2d 909 (1976).