TOWNSHIP OF PORT SHELDON v OTTAWA COUNTY BOARD OF
COMMISSIONERS

TOWNSHIP OF WRIGHT v OTTAWA COUNTY BOARD OF
COMMISSIONERS

1. TAXATION—PROPERTY TAX—EQUALIZATION—ASSESSMENT.

The process of equalization is one by which a county, and then
the state, seeks to enforce uniform property tax assessment
levels over the body of assessing units under its jurisdiction.

2. TAXATION—PROPERTY TAX—EQUALIZATION—REVIEW OF ASSESS-
MENTS.

A county's method of equalization of property tax assessments in
which the assessment figures of one-fourth to one-third of the
assessing units in the county are reviewed each year on a
rotating basis while the remaining units are assumed to be
properly assessed at 50 percent of cash value frustrates the
basic principles of the equalization process by creating unequal
assessment levels over the county in any particular year.

3. TAXATION—PROPERTY TAX—ASSESSMENT—EQUALIZATION.

A detailed survey by a county of each of the county's assessing
units each year is not necessary to achieve the goals of uni-
formity and equality of assessment, as long as the system of
equalization chosen by the county does not by design create tax
disparities between the various assessing units.

4. TAXATION—PROPERTY TAX—TAX TRIBUNAL—ASSESSMENT—ALTERA-
TION OF ASSESSMENTS—STATUTES.

The State Tax Tribunal has the statutory power to alter assess-
ments by making adjustments to equalized assessment figures

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4] 72 Am Jur 2d, State and Local Taxation §§ 799, 831 et seq.
[2] 71 Am Jur 2d, State and Local Taxation § 152.
[3] 72 Am Jur 2d, State and Local Taxation § 731.
[5] 71 Am Jur 2d, State and Local Taxation § 203.
72 Am Jur 2d, State and Local Taxation § 754.
Income or rental value as factor in evaluation of real property for
purposes of taxation. 96 ALR2d 666.

in order to reflect the true cash value of property; however, where a township's submitted assessment figure is at 50 percent of true cash value the Tax Tribunal does not have the authority to alter the stated assessment (MCLA 211.34[1], [3]; MSA 7.52[1], [3]).

5. TAXATION—PROPERTY TAX—ASSESSMENT—CASH VALUE—FARMLAND
—ACTUAL INCOME—STATUTES.

　　Actual income of land being farmed is a factor which must be taken into account when determining the cash value of the land for tax assessment purposes (MCLA 211.27; MSA 7.27).

Appeal from Tax Tribunal. Submitted June 20, 1977, at Lansing. (Docket Nos. 28587, 28519.) Decided December 5, 1977. Leave to appeal denied, 402 Mich —.

Petitions to the Michigan Tax Tribunal by the Township of Port Sheldon and the Township of Wright challenging the procedures used by Ottawa County in its equalization of the townships' property tax assessments for the year 1974. The Tax Tribunal consolidated the petitions for hearing, upheld the county's equalization procedures, and altered certain of Port Sheldon Township's assessment figures. Both townships appeal, and the appeals were consolidated by the Court of Appeals. Reversed and remanded to the Tax Tribunal.

*Bauckham, Reed, Lang & Schaefer,* for plaintiff Port Sheldon Township.

*James W. Bussard,* for plaintiff Wright Township.

*Eugene G. Wanger,* for defendant.

Before: D. F. WALSH, P. J., and QUINN and H. D. STAIR,* JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

H. D. STAIR, J. Appellants Township of Port Sheldon and Township of Wright have raised a common issue and two individual issues concerning the method of equalization of their property tax assessments for the year 1974. This Court has consolidated their appeals. We will first discuss the common issue.

Under the General Property Tax Act[1] all property subject to taxation within the State of Michigan shall be annually assessed by the supervisor or assessing officer of the various cities, villages or townships. MCLA 211.10; MSA 7.10. These assessments, after approval by the board of review of each assessing unit (MCLA 211.29; MSA 7.29) are submitted to the county board of commissioners. MCLA 211.34; MSA 7.52.

Under § 34(1), the county board of commissioners meets each year, and:

"shall examine the assessment rolls of the several townships or cities and ascertain whether the real and personal property in the respective townships or cities has been equally and uniformly assessed at true cash value. If, on the examination, it shall deem the assessments to be relatively unequal, it shall equalize the same by adding to or deducting from the valuation of the taxable property in a township or city an amount as in its judgment will produce a sum which represents the true cash value thereof, and the amount added to or deducted from the valuations in a township or city shall be entered upon the records. Notwithstanding any other provision of this act, effective December 31, 1970, the boards of commissioners and the state tax commission shall equalize real and personal property, separately by adding to or deducting from the valuation of taxable real property, and by adding to or deducting from the valuation of taxable personal property in a township, city, or county, an amount as will produce a sum which

---

[1] MCLA 211.1 et seq.; MSA 7.1 et seq.

represents the proportion of true cash value established by the legislature. * * * Equalized values for both real and personal property shall be equalized uniformly at the same proportion of true cash value in the county. The county board of commissioners shall also cause to be entered upon its records the aggregate valuation of the taxable real and personal property of each township or city in its county as determined by it. The board shall also make alterations in the description of any lands upon the rolls as may be necessary to render the descriptions conformable to the requirements of this act."

Section 34(2) mandates the creation of county equalization departments to assist the various county boards of commissioners in this task.

After county equalization has been completed, the assessment figures are transmitted to the State Board of Equalization.[2] The state board then seeks to equalize the levels of assessment between the state's 83 counties. MCLA 209.4; MSA 7.604.

By constitutional provision assessment for property tax purposes cannot exceed 50% of actual cash value:

"The legislature shall provide for the determination of true cash value of such property; the proportion of true cash value at which such property shall be uniformly assessed, which shall not, after January 1, 1966, exceed 50 percent; and for a system of equalization of assessments." Const 1963, art 9, § 3.

In MCLA 211.27; MSA 7.27, the Legislature mandated that all property "shall be assessed at 50% of its true cash value", in line with the constitutional limit.

The process of equalization is one by which the county, and then the state, seeks to enforce uni-

2 MCLA 209.1 *et seq.;* MSA 7.601 *et seq.*

form assessment levels over the body of assessing units under its jurisdiction. For example, city A's assessor determines the true cash value of the property in the city and submits its assessment figures to the county. City B does likewise. The county then reviews the assessment figures and determinations of cash value. If the county assessors disagree with the city's figures as to cash value, or if the city's assessment level falls below 50% of the cash value, the county multiplies the city's assessment figure by the ratio calculated to bring the assessment level to the 50% standard. In this way the county ideally will equalize assessment levels over the entire county, thereby eliminating disparities both in tax burdens borne by the taxpayers of the individual units and in the amount of state aid (education, welfare, etc.) available to the units.[3]

In 1974 appellants submitted their assessment figures to Ottawa County. There are 23 assessing units within Ottawa County. The practice of the county has been to equalize on a rotation basis. This system entailed review of 1/3 to 1/4 of the assessing units each year on a rotating order. The remaining units' assessment figures were accepted as if assessed at the 50% level. In 1974 Ottawa County's Board of Commissioners and equalization department studied six governmental units within the county, including appellants.

As a result of the 1974 equalization study, the county determined that Port Sheldon Township has assessed at a level of 37.02% of true cash value and accordingly increased the total assess-

[3] For a more detailed explanation of the intricacies and effects of the equalization process *see* Emmet County v State Tax Commission 397 Mich 550, 559–569; 244 NW2d 909 (1976) (WILLIAMS, J., dissenting); Comment, *The Michigan Property Tax: Assessment, Equalization, and Taxpayer Appeals,* 17 Wayne L Rev 1397 (1971).

ment figure of the township by a factor of 1.36. Wright Township was found to be assessing at 39.63%, and its assessment was therefore increased by a factor of 1.27. An assessment taken at face value to be at the 50% level would receive a multiplier ratio of 1.0, leaving the assessment unchanged.

Appellants challenged the equalization procedures of the county before the Michigan Tax Tribunal. The Tribunal indicated in its opinion that there were deficiencies in the manner in which Ottawa County rotated its equalization studies:

"In our view, it must be stressed that county equalization is not an assessing process. Its main purpose is to insure a uniform level of assessment between local taxing units within the county and to arrive at an aggregate valuation of such local units at 50% of true cash value. There is no statutory direction as to whether equalization must be by actual appraisal or by study nor as to the number of units appraised or studied or whether the units appraised or studied must be appraised completely or spotchecked—however, any method the county adopts must be uniformly applied in a non-discriminatory manner to all and it must be fair, just and equitable within reasonable acceptable standards. If it is on a regular cycle basis whereby a 1/3 or a 1/4 or so of the local units are studied or appraised on an annual basis because realistically and economically it is the only reasonable efficient and effective feasible method to perform such governmental function, this method would appear legally sufficient. However, it appears that if such method is used to apply only to the local units appraised or studied and not used as a spotcheck for purposes of determining total county aggregate value, such method creates only a partial annual county equalization and not the whole as required by law. If in the alternative, such appraisals or studies of the 1/3 or 1/4 or so units are applied countywide whether or not accompanied by spotchecks of the balance of the units within the county it follows that,

although not the best or preferable method it should and in our opinion does suffice to meet the lawful annual county equalization requirements. To do otherwise, is not to equalize the non-appraised or non-studied units for periods of 3 to 4 years and when such units are appraised or studied during their cyclical time there results a great disparity between the true cash value and assessed value in the local unit, resulting in a ratio accompanied with an abnormally high factor as the records herein historically reveal."

MTT Docket No. 4-122 pp 4–5

While the Tribunal recognized the disparity in any given year between the assessment adjustments imposed by the county equalizers on those units studied in that year as opposed to the remaining units, the opinion did not reject this method for the year in question:

"As a consequence, in 1974, of the 6 units studied, the percentage of increase of equalized value over the preceding year was as follows: 43%, 50%, 35%, 40%, 60% and 46%. Among the remaining 17 units not studied in 1974 the percentage of increase of equalized value ranged from a low of 3% to a maximum of 19%. The disparity in the one year increase in SEV between the units studied and those not studied makes it apparent that the method permits a substantial lag to occur in the two or three years intervening the studies of a given unit.

"While we are not disposed to hold that this practice is illegal in the instant case, such practice should be discontinued forthwith as it is sufficiently questionable that it may well be ruled invalid in future actions."

MTT, *supra* at 9

Appellants are now challenging the rotation method of equalization before this Court. We agree with the discussion of the Tax Tribunal that the rotating procedure frustrates the basic principles of the equalization process, and must consequently

reverse the decision of the Tribunal upholding the use of this method for the 1974 tax year.

In *Ann Arbor Twp v State Tax Commission,* 393 Mich 682, 687–688; 227 NW2d 784 (1975), the Michigan Supreme Court stated:

"Plaintiffs have raised another question concerning equalization. Noting that the constitutional goal in taxation is uniformity, plaintiffs argue that the STC subordinated that principle by denying the relevancy of evidence concerning the equalization results and practices in other counties.

"In *Allied Supermarkets, Inc v Detroit,* 391 Mich 460; 216 NW2d 755 (1974), we said that the 'process of equalization is designed to enhance the goal of uniformity'. That goal is achieved by both intra- and inter-county equalization, by uniformity within and between the counties.

"The STC's final order in this case intended to achieve uniformity within Washtenaw County. However, its final order resulted in an increase in the state equalized valuation of Washtenaw County. In attempting to achieve uniformity within counties, it must be remembered that uniformity should also be maintained between counties. In balancing the one scale the other should not be unbalanced." (Footnotes omitted.)

A similar analysis is applicable to the case at bar. Ottawa County, by studying only a limited number of its governmental units per year, maintained uniformity between those units at the cost of creating disparity between them and the remaining units within the county. While the county's argument that over the term of the cycle all of the units are actually studied shows a lack of discrimination in the method, the fact remains that the county is statutorily mandated to equalize the assessment figures on a yearly basis. MCLA 211.34; MSA 7.52. There is no question but that the rotation method creates unequal assessment

levels over the county in any particular year. This frustration of the principle of equalized tax levels is not overcome by a system of planned rotation of the tax disparities. See *In re Appeal of General Motors Corp,* 376 Mich 373; 137 NW2d 161 (1965).

In a related situation the Michigan Supreme Court found that a varying method of determining the tax levels violated the goal of equal treatment. In *Titus v State Tax Commission,* 374 Mich 476; 132 NW2d 647 (1965), the Court found it a denial of equality and uniformity for a city assessor to use a different method to assess approximately 20% of the city than was used for the rest of the property. The possibility that the new method might in the future be applied to the entire city did not condone the disparity arising in the particular year in which the different methods were used.

While appellee in the present case is correct that assessment and equalization are different concepts, the rationale of the *Titus* decision applies to the instant situation. Ottawa County essentially employed a different system of equalization to appellants in 1974 than it did to the majority of other governmental units in the county. Since uniformity is the "primary" goal of equalization[4], this intentional exercise in selective review is facially invalid.

We are not unmindful of the county's response that it would be economically impossible for the equalization department to do a full study of each unit each year unless the department was drastically increased in personnel and funding. In rejecting the county's rotation method we are not conversely requiring that the county do a detailed survey of each city and township for every year.

[4] *In re Appeal of General Motors Corp, supra* at 379.

There are methods by which the county can achieve the goals of uniformity and equality within the limitations of its resources. For example, as indicated in the Tax Tribunal's opinion[5], an acceptable method of equalization would be to randomly sample all of the units or a given number of units to determine equalization factors to then be applied to each unit in the county, as long as the system chosen does not by design create tax disparities between the concerned units.

We therefore reverse the holding of the Tax Tribunal and remand the matter for a uniform reappraisal of Ottawa County's 1974 tax assessments.

Port Sheldon Township's individual issue deals with the treatment given to its various classes of real property. Approximately 80% of the real property consists of industrial property owned by Consumers Power Company. The township's assessment of the Consumers Power property was $43,101,897.

When the county conducted its review of the township's assessment figures no reevaluation of the industrial property was undertaken. Instead, the county reviewed the assessments and cash values of the remaining 20% of real property in the township. From this study an average assessment level of 37.02% was calculated. The county then reevaluated the cash value of the industrial property, using the township's assessment figure as 37.02% of cash value, to be $116,428,679. The 37.02% assessment level calls for an equalization ratio of 1.35.

Consumers Power appealed its assessment in a separate case to the Tax Tribunal[6]. In the instant

[5] MTT, Docket No. 4-122, p 5.

[6] MTT, Docket No. 4-1512.

case the Tribunal took notice of a stipulation as to true cash value entered into as part of the Consumers Power case. The Tribunal thus set the cash value of the industrial property as $86,203,794, slightly more than the stipulated value and exactly twice the township's assessment figure. However, the Tribunal then did not accept the township's assessment figure as compliance with the 50% standard, but rather, apparently accepting the previous figure of 37.02%, lowered the assessment figure to $31,912,264. The result of the reduction of the assessment for the industrial property was to retain the equalization ratio of 1.35 for the entire township.

The township now challenges the Tribunal's authority to revise an assessment figure by means other than the equalization ratio. The township argues that had the industrial property been found to have been assessed at 50%, the average assessment level for all real property would have been 46.87%, with a resulting equalization ratio of 1.0667. By amending the assessment figure itself prior to the application of the ratio, the township contends, the Tribunal has invalidly equalized by class of property rather than by governmental unit.

In an appeal to the Tax Tribunal concerning assessments and equalization, the Tribunal is given statutory power to alter assessments:

"The state tax tribunal shall, upon hearing determine if in its judgment there is a showing to the effect that the equalization complained of is unfair, unjust, inequitable, or discriminatory. The state tax tribunal shall have the same authority to consider and pass upon the action and determination of the board of commissioners in equalizing valuations as it has to consider complaints relative to the assessment and taxation of property.

* * * If the state tax tribunal shall decide that the determination and equalization made by the board of commissioners is correct, no further action shall be taken. If the state tax tribunal, after the hearing, decides that the valuations of the county have been improperly equalized, it shall proceed to make deductions from, or additions to, the valuations of the respective townships, cities, or school districts as may be deemed proper, and in so doing the tribunal shall have the same powers as the board of commissioners had in the first instance." MCLA 211.34(3); MSA 7.52(3).

The power of the board of commissioners is set out in MCLA 211.34(1); MSA 7.52(1), which reads in part:

"The county board of commissioners shall examine the assessment rolls of the several townships or cities and ascertain whether the real and personal property in the respective townships or cities has been equally and uniformly assessed at true cash value. If, on the examination, it shall deem the assessments to be relatively unequal, it shall equalize the same by adding to or deducting from the valuation of the taxable property in a township or city an amount as in its judgment will produce a sum which represents the true cash value thereof, and the amount added to or deducted from the valuations in a township or city shall be entered upon the records. Notwithstanding any other provision of this act, effective December 31, 1970, the boards of commissioners and the state tax commission shall equalize real and personal property, separately by adding to or deducting from the valuation of taxable real property, and by adding to or deducting from the valuation of taxable personal property in a township, city, or county, an amount as will produce a sum which represents the proportion of true cash value established by the legislature."

The resulting power of the Tax Tribunal is to make adjustments to the equalized assessment

figures in order to reflect the true cash value of the property. True cash value is reflected when the assessment level is at the statutorily-mandated level of 50%.

In the instant case the Tax Tribunal found that the true cash value of the industrial property in Port Sheldon Township was $86,203,794. At this point the township's submitted assessment figure of $43,101,897 met the 50% level and thus reflected the true cash value. Under its statutory authority the Tax Tribunal did not have the authority to then alter the stated assessment. It appears that the Tribunal felt obligated to apply the previously determined average assessment ratio of 1.35 to the industrial property. Having found the county in error as to the property's cash value, the Tribunal was in error in applying an average assessment figure that ignored 4/5 of the property concerned.

Given that the township did in fact assess the industrial property at the 50% level, the average rate of assessment for the township should have been adjusted by the Tribunal. We likewise must remand this issue to the Tribunal for redetermination of the township's assessment.

The final issue was raised by Wright Township. The county appraiser testified that in reaching a cash value figure for agricultural property in the township he disregarded the present economic income of the property. Instead, the appraiser considered solely the "soil capability" of the land.

Cash value is defined in MCLA 211.27; MSA 7.27:

" 'Cash value', means the usual selling price at the place where the property to which the term is applied shall be at the time of assessment, being the price

which could be obtained for the property at private sale, and not at forced or auction sale."

To aid assessors, the Legislature included a list of factors relevant to the determination of cash value:

"the assessor shall also consider the advantages and disadvantages of location, quality of soil, zoning, existing use, present economic income of structures, including farm structures and *present economic income* of land when the land is being farmed". (Emphasis added.) MCLA 211.27; MSA 7.27.

The township argues that the county, in ignoring the "present economic income" of the land, violates the statutory definition of cash value. The county responds that consideration of actual economic income to determine cash value will benefit a lazy farmer through reduced taxes and encourage the holding of farm land for speculation.

While this Court finds the county's motives to be laudable, the clear language of the statute requires us to hold their methods unacceptable. In a similar situation, the Michigan Supreme Court held that an assessor must take into account the actual rent earned from income-producing property rather than the "going rate" for similar property in the area, even where the actual rent is substantially less:

"Unlike 'economic rent', 'economic income' is not a well-defined term of art. Given this fact, the statutory meaning of this term must be derived from the statutory and constitutional context within which the term is used. From this context it is apparent that the Legislature intended that 'economic income' would have relation to the definition of 'usual selling price' (or fair market value) of property under assessment. The tax

commission's construction permits the assessor to contend that actual income relevant to a determination of 'usual selling price' may be ignored. If the Legislature intended the construction urged by the tax commission it was incumbent upon that body to make such intention apparent by its choice of statutory language. Given a failure of clear legislative expression in this regard, such a construction is not tenable. We conclude that 'economic income' as used in MCLA 211.27; MSA 7.27 means actual income." (Footnote omitted.) *CAF Investment Co v State Tax Commission,* 392 Mich 442, 454; 221 NW2d 588 (1974).

Even though actual income is not the sole factor in determining cash value ("soil quality" is expressly included in the statute), the assessor cannot ignore its effect on the market value of farm land. On remand the actual income of agricultural property must be taken into account in order to assess farm property.

We find no error in the county's valuation of agricultural property in terms of small parcels of land, since the evidence indicates that there were no sales of large parcels by which market value could have been evaluated.

Remanded to the Tax Tribunal for proceedings consistent with this opinion. No costs, this being a public question.