KENT COUNTY v STATE TAX COMMISSION

Docket No. 71973. Submitted July 18, 1984, at Lansing.—Decided February 19, 1985.

The State Tax Commission, on October 25, 1982, filed with the Department of Treasury an analysis of farm land values utilized in the Kent County Equalization Department's agricultural appraisals. The commission included a memo stating that Kent County intended to revise the land values downward, despite a belief that values had risen about 15%. The commission's tentative equalization report indicated preliminary agreement with the methodology used by Kent County. The commission also stated at a hearing in May, 1983, that it agreed with Kent County's initial value conclusions. After Kent County revised its farm land values downward, the commission rejected the new land values and performed a second review of the values. The commission then informed the Kent County Equalization Director that the commission's findings indicated an increase in agricultural land values of approximately 16.9%. The director argued that its agricultural values were nonuniform in relation to surrounding counties. The chairman of the commission requested that representatives of Kent County's Equalization Department gather information and evidence to support their criticisms of the commission's study and to support their downward revisions of the agricultural land values. A comparison of appraisals to sales performed by the commission indicated that appraisals were approximately 10% below selling price. Kent County's representatives argued that agricultural land values were not uniform in relation to neighbor-

REFERENCES FOR POINTS IN HEADNOTES

[1-6] 72 Am Jur 2d, State and Local Taxation §§ 799, 831-833.
  Standing of one taxpayer to complain of underassessment or nonassessment of property of another for state and local taxation. 9 ALR4th 428.
[2] 72 Am Jur 2d, State and Local Taxation §§ 831-833.
[3] 72 Am Jur 2d, State and Local Taxation §§ 753 et seq., 831-833.
[4] 72 Am Jur 2d, State and Local Taxation § 753.
[5] 72 Am Jur 2d, State and Local Taxation §§ 777, 778, 787, 831-833.
[6] 71 Am Jur 2d, State and Local Taxation §§ 109, 110.
  72 Am Jur 2d, State and Local Taxation §§ 831-833.

ing counties, that the commission had classified property as being of a higher quality than it actually was, and that the commission committed an error of law by not using identical methods for equalizing property in each county. As a result of hearings on these matters, Kent County again revised its agricultural land values, again reducing the values. The commission questioned the new revision and prepared another appraisal analysis, using the same methods as the Kent County Equalization Department but using its own sales and land values. The commission's analysis yielded a recommended state equalization value for agricultural real property in Kent County of approximately $8,000,000 more than Kent County's equalization value. The recommended equalization value recommended by the commission was adopted and certified. Kent County sought leave to appeal that decision to the Court of Appeals. Leave was granted. *Held:*

1. The commission did not commit an error of law in equalizing Kent County's agricultural property. The county's contention that the commission used an improper appraisal study is rejected.

2. The uniformity guarantee secured by the Michigan Constitution does not preclude the commission from using different methods in equalizing the various counties within the state. There was no error of law in the commission's rejection of Kent County's revised valuations.

3. The statutory process of state equalization, wherein the commission determines the preliminary equalized valuation and then, following a hearing, determines the final state equalized valuation, does not violate a county's right to due process.

Affirmed.

1. TAXATION — STATE TAX COMMISSION — STATE EQUALIZATION.

The State Tax Commission may, but is not required to, conduct actual appraisals or equalization studies for intercounty equalization; such procedures are primarily the responsibility of the various county assessors; the commission is responsible for reviewing sales information, appraisal methods and compliance or noncompliance with the State Tax Commission's Assessor's Manual by the various county assessors.

2. TAXATION — STATE EQUALIZATION — PROPERTY VALUES.

Property values vary from county to county so that one county cannot rely on property values in another county to relieve it of its obligation of conducting appraisals and equalization studies for intercounty equalization.

3. Taxation — Constitutional Law — Uniformity of Taxation — State Equalization.

The uniformity of taxation guarantee of the Michigan Constitution does not preclude the State Tax Commission from using different methods in equalizing the various counties of the state (Const 1963, art 9, § 3).

4. Taxation — Valuation — Uniform True Cash Value.

The single ultimate goal of valuation performed by tax assessors is to attain uniform true cash values, and since the method of valuation chosen must be that which is likely to render the most accurate results, identical methodology is not required of the various assessors.

5. Appeal — Taxation — State Equalization.

Appellate review of determinations made by the State Tax Commission concerning intercounty equalization for purposes of taxation is restricted to a review for fraud, error of law or the adoption of a wrong principle.

6. Taxation — State Equalization — Due Process.

The statutory process of intercounty equalization by the state does not violate a county's right to due process by virtue of the fact that the State Board of Equalization is statutorily mandated to determine the preliminary state equalized valuation and then, following a hearing, determine final state equalized valuation; the board has no special pecuniary interest or accusatory function in the state equalization process, there is no adversarial relationship between the board and the counties, and the governmental interest in equalization far outweighs any effect on private interests or any potential for erroneous deprivation of such interest which may be occasioned by the state equalization process (MCL 209.4; MSA 7.604).

*Varnum, Riddering, Schmidt & Howlett* (by *Jon F. DeWitt* and *Richard W. Butler, Jr.*), for plaintiff.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Richard R. Roesch* and *Ross H. Bishop,* Assistants Attorney General, for defendant.

Before: DANHOF, C.J., and D. E. HOLBROOK, JR., and C. W. SIMON,* JJ.

DANHOF, C.J. Kent County appeals by leave granted from the 1983 state (or intercounty) equalization of agricultural real property. The final equalization was certified on May 24, 1983, by the State Tax Commission. Plaintiff raises three issues on appeal. We affirm on all three.

On October 25, 1982, the STC filed with the Department of Treasury an analysis of farm land values utilized in the Kent County Equalization Department's agricultural appraisals. Defendant utilized information gathered by the County Equalization Department. Attached thereto was a memorandum from defendant indicating that plaintiff intended to revise these land values downward, despite a belief that values had risen about 15%. The projected true cash value for the agricultural land study sample was established at $12,869,217. At that time, the STC's tentative equalization report (Form L-4030) dated October 28, 1982, indicated preliminary agreement with plaintiff's methodology. At a May 18, 1983, hearing, defendant also stated that it agreed with plaintiff's initial value conclusions.

On November 27, 1982, the STC performed a second review of land values in Kent County. This was done because the STC rejected the county study once values had been revised downward by Kent County Equalization Director James Neller. Plaintiff's first revision of values yielded a projected true cash value for the agricultural land study sample of $11,503,437.

After meetings on December 14, 1982, and February 1, 1983, between James Johnson, STC District Supervisor for Kent County, and Neller,

* Circuit judge, sitting on the Court of Appeals by assignment.

Johnson informed Neller that the STC staff findings from the compilation of appraisals indicated an increase in agricultural land values approximating 16.9%. Additional meetings were held on April 8, 1983, at which time Johnson delivered copies of the STC's agricultural appraisals to Neller, and again on April 21, 1983, when plaintiff argued that its agricultural values were nonuniform in relation to surrounding counties. Thereafter, Robert Vandermark, Chairman of the STC, requested that plaintiff's representatives gather information and evidence to support their criticisms of the STC study and to provide back-up data in support of their downward revisions to the county's agricultural class. Vandermark explained the requests and the nature of the studies at the May 18, 1983, hearing:

> "*Vandermark:* Also, at the 4/26 meeting, I asked our staff to run some checks of the staff work and I also had them, of the staff appraisal study, and I also asked our staff to run some checks against the county equalization department study. *Now at that meeting, on the 26th, I asked for a soil grid, land value map. I also asked for a listing of the sales that were used in the county study. Now I did get a list of the sales used to set county values. I didn't get anything else. Our staff, at that time, had their land value map, they had a sales analysis of how they arrived at the acreage values, and so on.* That was all exchanged at that time." (Emphasis added.)

Pursuant to Vandermark's request, a comparison of appraisals to sales was performed by defendant. That study indicated that appraisals were approximately 10% below selling price.

Meetings were also held between the parties on May 4, 5, 12, 18, and 19, 1983. The thrust of plaintiff's objections was that agricultural land

values were not uniform vis-à-vis neighboring counties, in particular with respect to Ionia County. Plaintiff complained that number 1 land valuations (the highest quality) were unrealistically high when compared to similar valuations in Ionia County, which assertedly had the highest quality of agricultural land. Plaintiff further argued that defendant classified too many parcels as number 1 land and that defendant failed to consider slopes and other factors detracting from land value. Additionally, plaintiff claimed that defendant committed an error of law by not using identical methods for equalizing each county. Based on its belief that agricultural values would have to be reduced, plaintiff revalued its lands through an agricultural study dated December 28, 1982. The nature of plaintiff's study was fully discussed at the May 28, 1983, hearing:

"*Vandermark:* [In the December 28, study, you've] got a listing, a typed listing, with all the true cash values or appraised values, you've got the assessed values here and they're used to arrive at ratios. Now we notice here that a lot of those numbers have been of the true cash values have been crossed out. There've been inked in, or penciled in, some alternative numbers. Now the report we're getting from the staff is that the original numbers the ones that have been crossed out, pretty well verified and agreed with the value conclusions that the staff was coming to in your county in the AG class. Agreed close enough that they probably would have adopted the apparent original numbers.

"I'd like to know what, number one: the new values were based on. I'd also like to know what sales data that the old values were based on. * * *.

* * *

"*[Neller:* The same sales data were used to calculate the original appraisals and the revised appraisals.]

"*Vandermark:* Well, you used the same ones?

"*Neller:* Our people—Mr. Chairman, our people—

"*Vandermark:* —the old values and the new values—

"*Neller:* Mr. Chairman, our people do the same thing your people do. *They make judgments about the applicability and the quality*—

"*Vandermark:* —*that change was a judgment change. It was not based on any additional sales*—

"*Neller:* —*the changes were judgments.*

"*Vandermark:* Okay.

\* \* \*

"*Neller:* \* \* \* *[W]e had this land value—vacant land value study. It's indicated that the land values have increased* in the twenty-four month period, the legal one, the rule—your rules, twenty-four month period over and above the twenty-four month period one year before that. *Fifteen percent increase in vacant land values.* But, I had nothing—two or three sales and they were in industrial areas, of vacant land. Over twenty acres. *Now I made the assumption—and an erroneous one in my opinion—that all land had gone up that much.* So my—this helps with my own staff. We made a land value guide, based on that that the field people worked with, making agricultural values.

\* \* \*

"*Neller:* When I discovered that in other counties, the increase was going to be a two or three percent of AG, I took another look and decided that I'd been wrong to jump to the conclusion that all land values had gone up fifteen percent. And so we had to cut it back. And so I do with the help of the assessors showing us how this— what was more appropriate. And I told them that that's what I was going to do. That's what we did. We cut it back to where we thought it was more appropriate in terms of the market, *even though it's derst [sic, dearth] of sales.* I was particularly concerned when I heard— and this was just a verbal communication—that Ionia County, which has better land than we have and more of it, for grow crops at least, was the highest value, they're using class one land—twelve hundred dollars an acre and their study had been approved. In writing by the Tax Commission. As early as September. I don't know how they got done that early, but they did. Now that's all—we had been using thirteen hundred dollars

an acre for our best land in areas that are a long ways from urban areas—thirty miles urban. And so we cut it back accordingly. The whole thing. That's how it was decided upon." (Emphasis added.)

Ultimately, plaintiff's revised land values caused a further (second) revision of its agricultural land study sample. Based on the new land values assigned by plaintiff, the projected true cash value of the sample was $9,529,730. Pursuant to this final revision, plaintiff set its state equalized valuation at $91,602,550. Defendant questioned the results of this second revision because of the further reduction. Moreover, since no supporting data were furnished to the STC, as requested, the STC prepared another appraisal analysis using the same appraisal sample and appraisal cards as the county; however, it used its own sales and land values. Additionally, because plaintiff had made alterations in the actual appraisals (as opposed to the land values), defendant was further suspicious of plaintiff's results. Therefore, defendant substituted its land values (based on sales) for plaintiff's. This analysis yielded a projected true cash value for agricultural real property in the amount of $198,516,401, after adjustments for new and lost value, with a resulting recommended state equalized valuation of $99,258,206. The recommended value was adopted.

The county first argues that the STC committed an error of law in equalizing plaintiff's agricultural real property by using an improper appraisal study. Plaintiff posits this claim of error on Chapter IV of the STC's Assessor's Manual, which specifies the procedures and techniques to be followed in appraising farm land. Plaintiff contends that the STC did not follow its own procedures in conducting its "appraisal study" in that it failed to

perform on-site inspections of the 171 parcels in the study and failed to interview individual farmers and prepare detailed maps of each parcel. Although the "Appraisal Procedure and Techniques" in Chapter IV of the Assessor's Manual does recite many of these procedures,[1] defendant is correct in asserting that these procedures do not govern its actions in the instant case. It is the *County* Department of Equalization which has the responsibility to perform an equalization study. Commission Rule 41,. 1982 AACS, R 209.41, states in part:

"Rule 41. (1) The county board of commissioners of each county shall establish a department of equalization and shall appoint a director of the department as provided in section 34 of the act.

\* \* \*

"(4) *The equalization director is responsible for making an equalization study of the assessed valuations and true cash value of each class of real estate and of personal property in each assessment district in the county each year for the purpose of determining the total value of the county* and the valuation of each assessing district, township, and city, for county and state equalization purposes.

"(5) In conducting an equalization study, *the equalization director shall use only the methods and procedures prescribed by the commission in chapter 16 of the manual,* as amended. Reports filed shall be on forms prescribed by, and in accordance with instructions furnished by, the commission." (Emphasis added.)

Furthermore, the commission's responsibilities are set forth in Rule 42, 1982 AACS, R 209.42, and encompass the following:

"Rule 42. (1) *In assisting* the equalization depart-

[1] See Assessor's Manual, Ch IV, pp 4-5.

ments in the conduct of the county equalization study, the commission staff shall perform as follows:

"(a) The staff *reviews sales information.*

"(b) The staff *reviews appraisal methods.*

"(c) The staff *observes and reports the compliance or noncompliance with the manual* to the commission.

"(d) The staff reports to the commission on tentative forms L4030, L4031, and L4032 by November 1.

"(e) The staff reports to the commission on preliminary forms L4030, L4031, and L4032 by February 1.

"(f) The staff makes a final report on forms L4030, L4031, and L4032 after the adoption of the equalization report by the county board of commissioners * * *." (Emphasis added.)

Thus, defendant's responsibility is not to conduct the actual appraisals or the equalization study, although it may undertake to do so. Rather, defendant is responsible for *reviewing* sales information, appraisal methods and compliance or noncompliance with the Assessor's Manual. As noted in Rule 41(5), the county equalization director *shall* use the methods and procedures prescribed in Chapter XVI of the manual. In this connection, it appears that plaintiff did not comply with such procedures,[2] especially in its revised studies, so that

---

[2] Chapter IV of the Assessor's Manual, which provides the acceptable approaches to valuation of farm land, states in relevant part:

"The Heavy reliance on behavior of the market in estimating the value of property is reflected in the Cost, Market, and Income Approaches to value. Each of these approaches must produce relatively accurate answers in relation to what the market reveals. Sales of comparable property and/or rental prices must be sought out, reviewed, verified and analyzed.

"The Cost Approach indicates the total value of agricultural real estate by (1) The total value of the land, plus (2) The total value contributed by the buildings and other improvements.

"An agricultural property should be appraised as a complete economic unit. *The value of the land should be computed first on the basis of vacant land sales to arrive at a price per acre. The improved property sales can then be included into the analysis and further confirm any findings that may have been arrived at on the vacant parcels.* The residual value, improved property sales minus estimated

defendant was justified in reviewing these revisions and adopting the original data gathered by plaintiff in lieu of plaintiff's unverified results.

Defendant conducted a review of plaintiff's property which analyzed the appraisal data and applied previously determined land values for particular types of soil. Defendant reviewed the initial data gathered by plaintiff and found it to be relatively accurate. The values per acre used by defendant had already been calculated and accepted. If plaintiff wished to reduce such values per acre,

---

land value, is an indication of the market value of the improvements and is a check on the values and depreciation used by the appraiser for the improvements.

"Once parcels which have sold have been analyzed as to indicated value of types of soil and buildings, they can be listed, compared, *and a common land value for a particular type of soil determined.*

\* \* \*

"Many sales in an area simplify an appraisers responsibility in estimating market value. There are many areas where an overabundance of sales does not exist. In these instances the most valid sales should be used along with the appraisers *[sic]* judgment and past experience. An appraiser should not set aside his judgment by arithmetically averaging the comparable sales to arrive at an indicated value.

"*Market value is derived from analysis of comparable sales information. The sales information must be as complete and accurate as possible.* Sources of information can be the buyer, seller, real estate broker, register of deeds, and equalization department records. When interviewing local residents inquire about recent sales in the area. Local residents can point out properties which have sold. The buyer or seller can then be contacted for the information needed." (Emphasis added.) Assessor's Manual, Ch IV, pp 1, 6.

This approach was required of plaintiff in order to reduce its projections of true cash value. The record, however, discloses that no new sales were applied in revising land values. Instead, plaintiff's "judgment" was that the values in surrounding counties were not increasing to the same extent as initially projected for Kent County, so that plaintiff, despite a "dearth of sales", merely "decided that [it had] been wrong to jump to the conclusion that all land values had gone up 15%". Such a revision does not bespeak a method that requires seeking out, reviewing, verifying, and analyzing comparable sales. The reference to an *appraiser's judgment* in the above-cited portion of Chapter IV does not refer to unverified reductions based on the *equalization director's* "judgment" that values in other counties were not increasing as much as projected for Kent County.

some form of verification was necessary. This is spelled out in Chapter XVI.

Chapter XVI of the Assessor's Manual, which addresses equalization, sets out various procedures to be followed in equalization. Assessment roll changes are to be calculated and *explained* on a Form L-4021 worksheet.[3] Furthermore, MCL 211.721; MSA 7.40, which specifically authorizes use of and compliance with the Assessor's Manual,

---

[3] The following statments are made throughout Chapter XVI with reference to this worksheet and the process of verification:

"The state tax commission requires each county equalization department to make an equalization study each year in each unit in the county and to furnish a copy of the study to the state tax commission before December 31st.

\* \* \*

"A sample, illustrating the use of form L-4021 has been reproduced on page 15. This form permits checking by the equalization department. *Notice that in 5 instances, the committee was able to correct the listing to the proper columns, based on the assessing officers [sic] stated reasons for changes.*" (Assessor's Manual, Ch XVI, p 21).

"ASSESSOR'S RESPONSIBILITY

"Has already completed the assessment roll for prior year and has classified it into 5 major classes of real and 5 major classes of personal property.

"1. Prepares the current assessment roll.

"2. Classifies the current assessment roll. (L-4019 and L-4020).

"3. Tabulates changes from prior assessments to current assessments for each major class, listing item or page and line numbers, prior assessment, current assessment, amount of new, loss or adjustment, *and the reason for the change in assessment.* (See Figure XVI-6 for example of L-4021.)" (Ch XVI, p 23).

\* \* \*

"The form L-4022 reproduced in this chapter reports the changes discussed for each of the 10 classes of property. The accuracy of the report depends on the knowledge and integrity of the assessor. Errors can be reduced *by requiring each assessor to submit back-up data on form L-4021 work sheets.*" Ch XVI, p 25.

\* \* \*

"Each year the assessing officer *is to account for all assessment changes* on form L-4021 and transmit it together with the form L-4022 to the county equalization department.

"*The documentation of the individual changes* contained in the L-4021 *will enable the equalization department to determine a more accurate equalized value for each unit.*" (Emphasis added.) Ch XVI, p 33.

also provides that all "assessing officials" maintain complete assessment records, including appraisal cards, tax maps, and value maps. Thus, the local assessing officials were required to maintain the data requested by defendant.

Finally, Rule 3(e), 1982 AACS, R 209.3, states that the STC may require "from any officer in this state" such reports which "shall enable the commission to ascertain the assessed value and equalized values of all property * * *."

In sum, not only does logic dictate that defendant may require plaintiff to verify its revised land values, but, by administrative rule and the Assessor's Manual, plaintiff was required to furnish back-up data on its revised valuations. Failure to do so justified defendant's more detailed *review* of plaintiff's original information. But the STC was not required to perform on-site observations of the individual properties, conduct interviews or develop maps. These procedures are required, in the first instance, of the local assessor. In addition, changes made to an assessment roll must be verified. We have been unable to glean any such verification from the record. Indeed, plaintiff admitted that the revision was based on "judgment" in light of the experience of other counties. Values, however, vary from county to county, and what happens in other counties cannot replace plaintiff's obligation of county equalization. See *Jackson County Bd of Comm'rs v State Tax Comm*, 130 Mich App 290, 293; 343 NW2d 255 (1983). There was no error of law.[4]

---

[4] We also note plaintiff's contention that the original information supplied by plaintiff was never intended to be a "preliminary report" of valuation, but, rather, only after the revisions was the report intended to supply accurate information. Plaintiff cites Rule 41(7) to the effect that only one report is required of a county equalization director, and that report is due on December 31. Plaintiff concludes that it was therefore improper to maintain, as defendant did, that

Plaintiff next challenges the use of different methods by the STC in performing intercounty equalization. Kent County's assessments were reviewed through an "appraisal study" while the counties of Allegan, Barry, Ionia, Montcalm, and Newaygo were reviewed by "sales-to-assessment" ratio studies. Plaintiff also asserts that in the cases of Ottawa and Muskegon Counties, no independent equalization study was conducted. The issue presented here is whether the uniformity guarantee secured by Const 1963, art 9, § 3 precludes the STC from using different methods in equalizing the 83 counties within the state. We hold that it does not.

Plaintiff cites *Titus v State Tax Comm,* 374 Mich 476; 132 NW2d 647 (1965), and *Port Sheldon Twp v Ottawa County Bd of Comm'rs,* 80 Mich App 91; 263 NW2d 299 (1977), *lv den* 402 Mich 939 (1978), in support of its position. In *Titus,* the plaintiffs challenged the method of assessment employed by the City of Lansing. For the tax year at issue there, 20% of the properties within the city were physically examined and reappraised on the basis of current sales prices for comparable land. Thereafter, the appraised value of improvements was increased by an established percentage, depending upon the subdivision in which the properties were located. The remaining properties were not physically examined. Rather, the assessments were based on previously determined appraised values and a review of the previous year's assessed values. These values were in turn adjusted by a

plaintiff's study was incompatible with the valuations projected from its "preliminary reports". Of importance, however, is that Kent County made revisions to its appraisal study without explaining the data which purportedly supported those changes. By contrast, defendant utilized appraisal cards compiled by plaintiff, which detailed the type of property, acreage and soil for each parcel studied and which were considered accurate by the STC. Those cards were complete. In the absence of verified data to the contrary, there was nothing improper about utilizing the original information.

"certain" percentage unrelated to the percentage adjustments applied to the reappraised properties. In ruling in favor of the taxpayers, the Supreme Court quoted language from *Exchange Bank of Columbus v Hines,* 3 Ohio St 1, 15 (1853), to the effect that " '[t]axing by a uniform rule requires uniformity not only in the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation; and this equality of burden cannot exist without uniformity in the mode of the assessment, as well as in the rate of taxation.' " 374 Mich 480.

In *Port Sheldon, supra,* the county system of equalization was on a rotation basis; that is, each year one-fourth to one-third of the assessing units were reviewed while the remaining units' assessments were accepted as being at the 50% level. During the tax year in question in *Port Sheldon,* six of the 23 units were reviewed, including the plaintiff township, with the township receiving a factor of 1.36. This Court held that the county's rotation method created "unequal assessment levels over the county in any particular year". The Court then cited *Titus, supra,* and stated:

"While appellee in the present case is correct that assessment and equalization are different concepts, the rationale of the *Titus* decision applies to the instant situation. Ottawa County essentially employed a different *system of equalization* to appellants in 1974 than it did to the majority of other governmental units in the county. Since uniformity is the 'primary' goal of equalization, *this intentional exercise in selective review is facially invalid.*

"We are not unmindful of the county's response that it would be economically impossible for the equalization department to do a full study of each unit each year unless the department was drastically increased in

personnel and funding. In rejecting the county's rotation method *we are not conversely requiring that the county do a detailed survey of each city and township for every year.* There are methods by which the county can achieve the goals of uniformity and equality within the limitations of its resources. For example, as indicated in the Tax Tribunal's opinion, an acceptable method of equalization would be to randomly sample all of the units or a given number of units to determine equalization factors to then be applied to each unit in the county, *as long as the system chosen does not by design create tax disparities between the concerned units."* (Emphasis added, footnotes omitted.) 80 Mich App 99-100.

Plaintiff argues that *Titus* and *Port Sheldon* instruct that the same method of equalization must be used by the STC in equalizing the various counties. We conclude, first, that the present case is distinguishable, but that, in any event, the nature of the equalization process is such that identical methodology is not necessarily required in order to attain uniformity in taxation.

The above-quoted language in *Titus, supra,* must be viewed in context. First, the appeal in *Titus* was not an equalization appeal which held that identical methods of equalization were required. Rather, *Titus* involved an individual assessment appeal to the STC pursuant to MCL 211.152; MSA 7.210. Moreover, the defects in the modes of assessment in *Titus* were great and could not have been cured through the equalization process since the assessments, in the first instance, did not lend themselves to comparison or equalization with the other assessments. Some 20% of the assessments were based on reappraisals while the remaining assessments were based upon an adjustment to the previous year's assessment which bore no relationship to the adjustments wrought by reappraisal.

This scheme contravened the very essence of uniformity in taxation.

In addition, that *Titus* did not establish a blanket prohibition against the use of varying approaches to valuation is further borne out in *Fisher-New Center Co v State Tax Comm,* 380 Mich 340; 157 NW2d 271 (1968), a case decided after *Titus,* wherein the Supreme Court specifically noted "that a uniform approach to valuation does not always result in uniform assessment. * * * While uniform approach may be desirable, it is not the ultimate goal of valuation. The ultimate goal is uniform true cash values. They are not necessarily achieved by a single uniform approach." (Citations omitted.) 380 Mich 369. The Supreme Court further stated that use and comparison of all available approaches to valuation would more likely reflect true cash value than would use of but a single method. The same rationale applies to the varying methods of equalization.

Turning to *Port Sheldon, supra,* it is readily apparent that the situation there is inapposite to the case at bar. The rotation method of equalization described above was found to be unacceptable because it was an *"intentional* exercise in selective review", which *"by design* create[d] tax disparities between the concerned units". (Emphasis added.) 80 Mich App 99-100. In other words, by reviewing only a portion of the county's assessing units and accepting the others at face value as being at 50% of true cash value, the county was not equalizing assessment figures on a yearly basis pursuant to MCL 211.34; MSA 7.52. 80 Mich App 98. This was not uniform because equalization "is designed to enhance the goal of uniformity". *Allied Supermarkets, Inc v Detroit,* 391 Mich 460, 466; 216 NW2d 755 (1974). Accord, *In re Appeal of General Motors*

*Corp,* 376 Mich 373, 379; 137 NW2d 161 (1965). If equalization is statutorily mandated to take place on a yearly basis, but a rotational method is used which intentionally (or by design) excludes certain units each year from this process, yearly uniformity is not achieved. Thus, what made the rotational method invalid was the fact that values were determined for different properties at different points in time.

In the case *sub judice,* no such method was employed. As noted in *Fisher-New Center, supra,* the ultimate goal of valuation is uniform true cash values. It is well settled that the method of valuation chosen must be that "which is likely to render the most accurate results". *Tatham v City of Birmingham,* 119 Mich App 583, 591; 326 NW2d 568 (1982). Accord, *Presque Isle Harbor Water Co v Presque Isle Twp,* 130 Mich App 182, 190-191; 344 NW2d 285 (1983).[5] Identical methodology is not required by Const 1963, art 9, § 3.

Here, the reason for employing different methods for the various counties surrounding Kent County is not readily discernible from the record. It may have been due to the "dearth of sales" in Kent County. Moreover, defendant disputes plaintiff's contention that no review was performed on Muskegon and Ottawa Counties. Defendant asserts that a review of their procedures indicated compli-

---

[5] While these cases address the *assessment* of property, and assessments and equalization are not "coincident", both are related and both are part of the "'separate but intertwining paths' leading to equality of [tax] treatment". *Allied Supermarkets, supra,* p 466. Therefore, if the method of assessment may vary according to the particular circumstances, so too may the method used in equalizing the various counties. As a practical matter, if uniform methodology were required, any equalization study which, due to lack of sales, information, or any other reason, was based on a method considered less reliable, but which was dictated by those particular circumstances, would force all other studies to utilize such method even where the information necessary for a more reliable study was present.

ance with the Assessor's Manual, so that further investigation was unncecessary. Defendant is correct in its assertion that a detailed survey of each unit is not required. *Port Sheldon, supra,* p 99. In any event, the reasons are largely factual in nature. Since defendant, when sitting as the State Board of Equalization, is not required to make findings of fact or render a formal opinion, review of the matter is limited. Appellate review of state equalization is restricted to a review for fraud, error of law or the adoption of a wrong principle. *Jackson County v State Tax Comm, supra,* pp 295-296. Plaintiff has established none of these, but, rather, has essentially asserted that uniformity in taxation requires the same methodology. Since it appears that defendant's reasons for rejecting plaintiff's revised valuations were proper, we conclude that there was no error of law.

Plaintiff's final claim of error is that the process of state equalization pursuant to MCL 209.4; MSA 7.604 violates a county's right to due process. Plaintiff argues that the probability of actual bias is too great and that where such risk of bias is present because the decisionmaker might be prejudiced due to prior participation as an accuser, investigator, fact-finder, or initial decisionmaker, such risk of bias constitutes a violation of due process. Plaintiff reasons that, since the STC is statutorily mandated to determine the preliminary state equalized valuation and then, following a hearing, determine final state equalized valuation, the risk of bias is intolerably high. It also suggests that the statutory mechanism for equalization violates a county's right to due process in that the STC reviews its own studies and information against that furnished by the counties, with the counties' information being placed at an inherent disadvantage. Plaintiff cites *Crampton v Dep't of*

*State,* 395 Mich 347; 235 NW2d 352 (1975); *Vayiar v Vic Tanny International,* 114 Mich App 388; 319 NW2d 338 (1982); *Goldberg v Kelly,* 397 US 254; 90 S Ct 1011; 25 L Ed 2d 287 (1970), and *Morrissey v Brewer,* 408 US 471; 92 S Ct 2593; 33 L Ed 2d 484 (1972), for the proposition that the state equalization process violates due process. We disagree.

In *Crampton, supra,* the Supreme Court discussed many of the situations held to be constitutionally intolerable by the United States Supreme Court.

"A hearing before an unbiased and impartial decisionmaker is a basic requirement of due process.

"The United States Supreme Court has disqualified judges and decisionmakers without a showing of actual bias in situations where 'experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'. Among the situations identified by the Court as presenting that risk are where the judge or decisionmaker

"(1) has a pecuniary interest in the outcome;

"(2) 'has been the target of personal abuse or criticism from the party before him';

"(3) is 'enmeshed in [other] matters involving petitioner * * *'; or

"(4) might have prejudged the case because of prior participation as an accuser, investigator, fact finder or initial decisionmaker." (Footnotes omitted.) 395 Mich 351.

In *Crampton,* the plaintiff was arrested for driving under the influence of intoxicating liquor and refused to submit to a chemical test to determine the alcohol content of his blood. His license was immediately suspended and he requested a hearing before the License Appeal Board. A two-member panel consisting of a full-time police officer and a representative of the Secretary of State denied

his appeal. The Supreme Court declared that this situation denied plaintiff his right to due process. In so holding, the Supreme Court found unacceptable the fact that "officials who are entrusted with responsibility for arrest and prosecution of law violators [also sit] as adjudicators in a law enforcement dispute between a citizen and a police officer". 395 Mich 356. The Court further stated that "[a]s law enforcement officials they are identified and aligned with the state as the adversary of the citizen who is charged with violation of the law. Their function and frame of reference may be expected to make them 'partisan to maintain' their own authority and that of their fellow officers". (Footnote omitted.) 395 Mich 357. The risk of bias was deemed intolerably high.

Plaintiff also relies on *Vayiar, supra,* which held that a Workers' Compensation Appeal Board panel consisting of two representatives of employees' interests and one representative of the employer's interest denied the employer due process. This conclusion was based on the statutory provision providing for the composition of a Workers' Compensation Appeal Board panel which, by definition, made certain members "identified and aligned with" one of the parties' interests.

Additionally, the United States Supreme Court in *Mathews v Eldridge,* 424 US 319; 96 S Ct 893; 47 L Ed 2d 18 (1976), which discussed *Morrissey, supra,* and *Goldberg, supra,* stated that due process is not "a technical conception" that can be applied on the basis of general and fixed rules. The Court noted:

"More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by

the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, *including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.* See, *e.g., Goldberg v Kelly, supra,* [397 US] at 263-271." (Emphasis added.) 424 US 334-335.

When the instant case is gauged by these standards, it is readily apparent that the situation presented here is very different from *Crampton* and *Vayiar.* First, defendant is correct in its assertion that it has no special pecuniary interest or accusatory function in the state equalization process. State equalization is unlike county equalization where the county has a direct budgetary interest in the outcome.[6] There is no adversarial relationship as is evidenced by the fact that state equalization is not considered to be a "contested case" within the meaning of the Administrative Procedures Act. *Emmet County v State Tax Comm,* 397 Mich 550; 244 NW2d 909 (1976). The STC's function in the state equalization process is more ministerial and information-gathering in nature than it is adversarial. Indeed, many of its tasks are jointly undertaken with the counties, and cooperation, not accusation, is the goal. With-

---

[6] In this connection, our Supreme Court in *Morris v Metriyakool,* 418 Mich 423, 437; 344 NW2d 736 (1984), noted that many questions of personal bias and remote interests in given disputes are matters of legislative discretion, not constitutional validity. Here, the Legislature's combining of several functions within the State Board of Equalization, see MCL 209.1 *et seq.;* MSA 7.601 *et seq.,* and the State Tax Commission, see MCL 209.102; MSA 7.632, was such a matter of discretion, there being no identity of interest with the taxing authorities which violates due process. See also, *Auditor General v Wayne County Supervisors,* 216 Mich 256, 259; 185 NW 157 (1921), which addressed an issue very similar to the one presented in the instant case.

out such adversarial relationship or pecuniary interest, there is no intolerable risk of bias.

Moreover, as the Supreme Court noted in *Emmet County, supra,* p 555, the nature of the taxation process is such that the fiscal and administrative burdens of an alternative procedure, which procedure has not been suggested by plaintiff, would be immense. The governmental interest here far outweighs any effect on private interests or any potential for "erroneous deprivation of such interest" which may be occasioned by the state equalization process and the numerous functions performed by the State Board of Equalization. *Mathews, supra.*

Affirmed.